# U.S. District Court
# Eastern District of New York (Brooklyn)
# CRIMINAL DOCKET FOR CASE #: 1:25−mj−00129−JAM All Defendants

Case title: USA v. Malanga et al

Date Filed: 04/09/2025

---

Assigned to: Magistrate Judge Joseph A. Marutollo

**Defendant (1)**

**Marcel Malu Malanga** represented by **Benjamin Zev Yaster**
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
718−330−1291
Fax: 718−855−0760
Email: benjamin_yaster@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:2339A.F | |

---

Assigned to: Magistrate Judge Joseph A. Marutollo

**Defendant (2)**

**Tyler Christian Thompson, Jr.** represented by **James M. Branden**
Law Office of James M. Branden
80 Bay Street Landing
Suite 7j
Staten Island, NY 10301
212−286−0173
Fax: 212−481−8250
Email: jamesmbranden@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:2339A.F | |

---

Assigned to: Magistrate Judge
Joseph A. Marutollo

**Defendant (3)**

**Benjamin Reuben Zalman−Polun** represented by **Sabrina P. Shroff**
Sabrina Shroff
Attorney
80 Broad Street
19th Street
20004
New York, NY 20004
646−763−1490
Email: sabrinashroff@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts** | **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts** | **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints** | **Disposition**

18:2339A.F

---

**Plaintiff**

**USA** represented by **Stephen Howell Petraeus**

United States Attorney's Office − Eastern District of N
271−A Cadman Plaza East
Brooklyn, NY 11201
718−254−6352
Email: stephen.petraeus@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/09/2025 | 1 | RULE 5 AFFIDAVIT/REMOVAL TO THE DISTRICT OF UTAH by USA as to Marcel Malu Malanga, Tyler Christian Thompson, Jr, Benjamin Reuben Zalman−Polun (FC) (Entered: 04/10/2025) |
| 04/09/2025 | | Arrest (Rule 5) of Marcel Malu Malanga, Tyler Christian Thompson, Jr, Benjamin Reuben Zalman−Polun (FC) (Entered: 04/10/2025) |
| 04/09/2025 | | Minute Entry for proceedings held before Magistrate Judge Joseph A. Marutollo:Arraignment as to Marcel Malu Malanga (1) Count Complaint and Tyler Christian Thompson Jr. (2) Count Complaint and Benjamin Reuben Zalman−Polun (3) Count Complaint held on 4/9/2025, Attorney Appointment Hearing as to Marcel Malu Malanga, Tyler Christian Thompson, Jr, Benjamin Reuben Zalman−Polun held on 4/9/2025, Initial Appearance in Rule 5(c)(3) Proceedings as to Marcel Malu Malanga, Tyler Christian Thompson, Jr, Benjamin Reuben Zalman−Polun held on 4/9/2025. |

| | | |
|---|---|---|
| | | AUSA Stephen Petraeus present. Dft Marcel Malu Malanga present w/federal defender Benjamin Yaster. Dft Tyler Christian Thompson Jr. present w/cja counsel James Branden. Dft Benjamin Reuben Zalman−Polun present w/cja counsel Sabrina Shroff. Removal proceeding to the District of Utah hearing held. All 3 dfts waived identity hearings in this district. All 3 dfts did not have bail applications to present. Commitment to another district orders entered for all 3 dfts. Rule 5f warnings given to the govt. Medical memos issued. (FTR Log # 4/9/25 5:15−5:35.) (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 2 | COMMITMENT TO ANOTHER DISTRICT as to Marcel Malu Malanga. Defendant committed to the District of Utah. Ordered by Magistrate Judge Joseph A. Marutollo on 4/9/2025. (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 3 | WAIVER of Rule 5(c)(3) Hearing by Marcel Malu Malanga (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 4 | CJA 23 Financial Affidavit by Marcel Malu Malanga (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 5 | COMMITMENT TO ANOTHER DISTRICT as to Tyler Christian Thompson, Jr. Defendant committed to the District of Utah. Ordered by Magistrate Judge Joseph A. Marutollo on 4/9/2025. (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 6 | WAIVER of Rule 5(c)(3) Hearing by Tyler Christian Thompson, Jr (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 7 | CJA 23 Financial Affidavit by Tyler Christian Thompson, Jr (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 8 | CJA 20 as to Tyler Christian Thompson, Jr: Appointment of Attorney James M. Branden for Tyler Christian Thompson, Jr. Ordered by Magistrate Judge Joseph A. Marutollo on 4/9/2025. (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 9 | COMMITMENT TO ANOTHER DISTRICT as to Benjamin Reuben Zalman−Polun. Defendant committed to the District of Utah. Ordered by Magistrate Judge Joseph A. Marutollo on 4/9/2025. (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 10 | WAIVER of Rule 5(c)(3) Hearing by Benjamin Reuben Zalman−Polun (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 11 | CJA 23 Financial Affidavit by Benjamin Reuben Zalman−Polun (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 12 | CJA 20 as to Benjamin Reuben Zalman−Polun: Appointment of Attorney Sabrina P. Shroff for Benjamin Reuben Zalman−Polun. Ordered by Magistrate Judge Joseph A. Marutollo on 4/9/2025. (FC) (Entered: 04/10/2025) |
| 04/09/2025 | 13 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations as to Marcel Malu Malanga, Tyler Christian Thompson, Jr, Benjamin Reuben Zalman−Polun. Ordered by Magistrate Judge Joseph A. Marutollo on 4/9/2025. (FC) (Entered: 04/10/2025) |

NEM:SHP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MARCEL MALU MALANGA,
TYLER CHRISTIAN THOMPSON, JR., and
BENJAMIN REUBEN ZALMAN-POLUN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

AFFIDAVIT IN SUPPORT OF
REMOVAL TO THE
DISTRICT OF UTAH

(Fed. R. Crim. P. 5)

Case No. 25-MJ-129

EASTERN DISTRICT OF NEW YORK, SS:

Adam Alattry, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

On or about April 5, 2025, the United States District Court for the District of Utah issued a warrant for the arrest of the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN, for violating Title 18, United States Code, Sections 2339A (conspiracy to provide material support and resources), 2332a(b) (conspiracy to use weapons of mass destruction), 2332f(a)(2) (conspiracy to bomb places of public use, government facilities, public transportation systems, and infrastructure facilities), 956 (conspiracy to murder and kidnap persons in a foreign country). MALANGA and THOMPSON were each also charged separately with violating Title 18, United States Code, Section 924(k)(2) (taking a firearm out of the United States to engage in a felony).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. On or about April 5, 2025, a criminal complaint was signed by United States Chief Magistrate Judge Dustin B. Pead in the District of Utah (the "Complaint") charging the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN with violating Title 18, United States Code, Sections 2339A (conspiracy to provide material support and resources), 2332a(b) (conspiracy to use weapons of mass destruction), 2332f(a)(2) (conspiracy to bomb places of public use, government facilities, public transportation systems, and infrastructure facilities), 956 (conspiracy to murder and kidnap persons in a foreign country). MALANGA and THOMPSON were each also charged separately with violating Title 18, United States Code, Section 924(k)(2) (taking a firearm out of the United States to engage in a felony). A true and correct copy of the Complaint is attached as Exhibit A.

2. In connection with the Complaint, on or about April 5, 2025, the United States District Court for the District of Utah issued warrants (the "Warrants") for the arrest of the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN. A true and correct copy of the Warrants are attached as Exhibit B.

3. On or about April 8, 2025, the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN were expelled from the Democratic Republic of the Congo ("DRC"). A representative of the DRC

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

government also provided American law enforcement with the original U.S. passports of defendants MALANGA, THOMPSON, and ZALMAN-POLUN.

4. The United States Embassy in Kinshasa, DRC, had also prepared emergency passports for the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN. These emergency passports were provided to a legal attaché with the FBI, who provided the emergency passports to American law enforcement. These emergency passports were used as the travel documents for the defendants on April 8, 2025.

5. The plane carrying the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN arrived at John F. Kennedy International Airport ("JFK") on April 8, 2025, at 11:38 PM. Upon arrival at JFK, the defendants were arrested pursuant to the Warrants.

6. At the time of their arrest on April 8, 2025, law enforcement was in possession of both the original and emergency passports for the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN. Law enforcement agents also compared the physical appearance of the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN to photographs in the file prepared by law enforcement agents that depict the MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN who are wanted in the District of Utah and observed that the defendants MALANGA, THOMPSON, and ZALMAN-POLUN appeared to be the same persons depicted in those photographs.

7. Based on the foregoing, I submit that there is probable cause to believe that the defendants are the MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN wanted in the District of Utah.

WHEREFORE, your deponent respectfully requests that the defendants MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON, JR., and BENJAMIN REUBEN ZALMAN-POLUN be removed to the District of Utah so that they may be dealt with according to law.

________________________________
Adam Alattry
Special Agent
Federal Bureau of Investigation

Sworn to before me this
9th day of April, 2025

________________________________
[illegible].O
[illegible]
[illegible]

# EXHIBIT A

FELICE JOHN VITI, Acting United States Attorney (#7007)
BRYAN R. WHITTAKER, Assistant United States Attorney (#16764)
JONATHAN STOWERS, Assistant United States Attorney (#16374)
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

TANYA SENANAYAKE, Trial Attorney (DC#1006218)
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARCEL MALU MALANGA,<br>TYLER CHRISTIAN THOMPSON, JR.,<br>BENJAMIN REUBEN ZALMAN-POLUN,<br>and<br>JOSEPH PETER MOESSER,<br><br>Defendants. | FELONY COMPLAINT<br><br>Count 1: 18 U.S.C. § 2339A, Conspiracy to Provide Material Support and Resources<br><br>Count 2: 18 U.S.C. § 2332a(b), Conspiracy to Use Weapons of Mass Destruction<br><br>Count 3: 18 U.S.C. § 2332f(a)(2), Conspiracy to Bomb Places of Public Use, Government Facilities, Public Transportation Systems and Infrastructure Facilities<br><br>Count 4: 18 U.S.C. § 956, Conspiracy to Murder and Kidnap Persons in a Foreign Country<br><br>Count 5: 18 U.S.C. § 924(k)(2), Taking a Firearm Out of The United States to Engage in a Felony [MALANGA]<br><br>2:25-mj-00346 - DBP |

| | |
|---|---|
| | Count 6: 18 U.S.C. § 924(k)(2), Taking a Firearm Out of The United States to Engage in a Felony [THOMPSON]<br><br>Chief Magistrate Judge Dustin B. Pead |

Before the Honorable DUSTIN B. PEAD, Chief United States Magistrate Judge for the District of Utah, appeared the undersigned, who on oath deposes and says:

OBJECT OF THE CONSPIRACY

1. The object of the conspiracy was to unlawfully carry out a coup d'état in the Democratic Republic of the Congo ("DRC"). The coconspirators conducted an armed military operation ("Armed Coup Attack") specifically targeting DRC President Félix Tshisekedi and Deputy Prime Minister for the Economy Vital Kamerhe ("Kamerhe"). Christian Malanga ("Christian") acted as a leader and organizer of these rebel forces. It was the goal of these rebel forces to topple the DRC government and to murder President Félix Tshisekedi, Kamerhe, and others, with the goal of installing Christian as the new president of the DRC. They intended on renaming the DRC to New Zaire. Marcel Malanga ("MALANGA") identified himself as the "Chief of Staff of the Zaire army" and also acted as a leader of the rebel forces. Benjamin Zalman-Polun ("POLUN") was Christian Malanga's chief of staff. Joseph Peter Moesser ("MOESSER") was the explosives maker, explosives technician, and explosives supplier. Tyler Thompson ("THOMPSON") was a soldier and drone specialist/operator.

2. It was also an object of the conspiracy for Christian, MALANGA, THOMPSON, POLUN, and MOESSER to provide material support and resources including services, training, expert advice or assistance, communication equipment, weapons, explosives, and personnel to the rebel army which was formed to overthrow the DRC government.

3. An additional object of the conspiracy was to acquire and use weapons of mass destruction during the Armed Coup Attack. The coconspirators planned to use bombs that could be deployed to their targets by drone(s). Targets included people, private residences, and public buildings. They also intended to attach a flamethrower device to a drone and use it as an incendiary device to light people on fire.

4. Further, the object of the conspiracy was to unlawfully and knowingly combine, conspire, confederate, and agree to commit any offense against the United States by, in the United States, knowingly beginning and setting on foot, and providing and preparing a means for, and furnishing the money for, and taking part in, a military expedition and enterprise to be carried on from the United States against the territory and dominion of a foreign state, namely the country of the DRC.

<u>MANNER AND MEANS OF THE CONSPIRACY</u>

5. The defendants MALANGA, THOMPSON, POLUN, and MOESSER, and their uncharged coconspirators, known and unknown to the United States Attorney, acted in concert to carry out the objectives of the conspiracy, both inside the United States and abroad, through various means including, but not limited to:

a. Conducting a military expedition and enterprise with the intent to overthrow the government of the DRC.

b. Planning, scouting out targets, and identifying victims for the Armed Coup Attack, with the purpose and intent to murder other persons, including high-level DRC government officials.

c. Recruiting others to join in the military enterprise and Armed Coup Attack as personnel for the rebel army and, in some cases, recruiting personnel in exchange for money.

d. Acquiring and attempting to acquire explosive and incendiary devices with the purpose and intent to use such devices to target individuals, private property, and DRC government buildings.

e. Communicating with and procuring destructive devices, to include carrier devices such as drones, explosives, incendiary devices, and delivery mechanisms, from businesses, private parties, and at least one individual associated with a foreign military to effectuate the Armed Coup Attack.

f. Procuring from businesses and private parties, military equipment to include firearms, ammunition, uniforms, communication equipment, and communication jamming equipment.

g. Planning to transport, and transporting, weapons, explosives, and resources from the United States to the DRC to effectuate the Armed Coup Attack.

h. Engaging in firearms and weapons training in the United States and in Africa to provide services and support during the conspiracy and Armed Coup Attack.

i. Communicating over social media platforms and meeting with each other in person to plan the Armed Coup Attack.

## OVERT ACTS

6. In furtherance of the conspiracy and to achieve the objects thereof, the defendants and others committed and caused to be committed, in the District of Utah, the DRC, and elsewhere, at least one of the following overt acts, among others:

a. MALANGA, THOMPSON, POLUN, MOESSER, and others made operational and logistical plans to overthrow the DRC government.

Case 2:25-mj-00126-DBP Document 1 Filed 04/05/25 Page 5 of 7 PageID.8

b. From in or about July 2023 through in or about March 2024, while in the United States, MALANGA corresponded with an individual claiming to work with a foreign military about drones and "shells used for air strikes." MALANGA also attempted to acquire hornet drones and shells that could be dropped from a drone.

c. In or about the summer of 2023, MALANGA, while in Utah, attempted to recruit Person #1, who was in Utah, to travel to Africa to perform security work, "like Secret Service" work, for Christian.

d. In or about early 2024, MALANGA and THOMPSON engaged in firearms training with handguns and rifles at a shooting range in the Salt Lake City, Utah, area.

e. On or about February 4, 2024, POLUN flew to Salt Lake City, Utah, to assist MALANGA with recruiting others to join the military expedition and enterprise and Armed Coup Attack.

f. In or about February 2024, MALANGA and POLUN, while in Utah, attempted to recruit Person #2,[1] who was also in Utah, by offering him $50,000 to go to Africa to "invade" someone's home and to join their military expedition and enterprise and Armed Coup Attack to "get everyone ready for arresting the Secretary of Defense" and to "raid the premises."

g. On or about February 25, 2024, MOESSER messaged Christian where he confirmed the prior meeting he had with both MALANGA and POLUN several days prior relating to, among other things, his work on "a proto-type of the other two units that you need." MOESSER also inquired about a shipping company that delivers to "the Congo".

---

[1] [redacted]

h. On or about February 29, 2024, MALANGA attempted to recruit potential soldiers by posting a message on Social Media Platform #1, which read "If you want to make $50-100k message me (warriors only)."

i. On or about March 3, 2024, Christian responded to MOESSER's February 25, 2024 message where he re-confirmed their agreement stating, "I look forward to following out our plan together we discussed many times. Now is the time for change."

j. MALANGA and THOMPSON researched and shopped for drones and drone attachments, including a TF-19 Wasp Flamethrower.

k. Between approximately March 8 and March 12, 2024, MALANGA messaged with Person #3 to discuss the capabilities of a DJI S1000 drone and to negotiate the purchase of that drone.

l. On or about March 12, 2024, MALANGA traveled from Utah to California to purchase a DJI S1000 drone that was to be used in the Armed Coup Attack.

m. On or about March 12, 2024, MALANGA met in person with Person #3 in Los Angeles, California and purchased a DJI S1000 drone from the seller.

n. On or about March 12, 2024, THOMPSON and Person #4 drove to the Salt Lake City International Airport and picked up the DJI S1000 drone purchased by MALANGA in Los Angeles, California.

o. On an unknown date, MALANGA and THOMPSON acquired a second drone, a DJI Mavic 2, that was to be used in the Armed Coup Attack.

p. In or about March 2024, Person #5 observed THOMPSON conducting test flights with the DJI Mavic 2 drone.

q. In or about March 2024, Person #5 observed THOMPSON and MALANGA attempting to conduct test flights with the DJI S1000 drone.

r. On or about March 13, 2024, THOMPSON contacted the seller of a TF-19 Wasp Flamethrower attachment "on behalf of Christian Malanga" to inquire about methods of acceptable payment.

s. On or about March 22, 2024, MALANGA purchased a TF-19 Wasp Flamethrower drone attachment.

t. On or about March 27, 2024, MALANGA emailed the seller of the TF-19 Wasp Flamethrower to request a tutorial explaining how to attach it to a DJI S1000 drone.

u. On or about March 29, 2024, MALANGA requested, via email, 25 military patches depicting the flag of the former Republic of Zaire from a Utah-based company.

v. On or about March 29, 2024, MALANGA directed Person #5 to purchase a drone payload airdrop system from an online seller for him to be used in the Armed Coup Attack.

w. On or about March 30, 2024, in preparations for the trip to Africa, MOESSER texted a photo of his [MOESSER's] United States Passport.

x. In or about April 2024, MALANGA attempted to recruit Person #6, who was located in Utah, to travel to Africa to "help provide security," and MALANGA informed him that a passport application could be expedited.

y. In or about April 2024, MALANGA, THOMPSON, MOESSER, and Person #2, practiced installing the TF-19 Wasp Flamethrower attachment to the DJI S1000 drone at MOESSER's residence in West Valley City, Utah.

z. Between in or about March and April 2024, MALANGA and THOMPSON corresponded via email with the seller of the flamethrower attachment.

aa. On or about April 8, 2024, MALANGA, THOMPSON, and MOESSER met together at MOESSER's residence in Utah where MOESSER demonstrated and provided training and instruction to the other members of the conspiracy on how the bombs/destructive devices worked.

bb. On or about April 8, 2024, MALANGA directed Person #5 to purchase a 500-lumen tactical weapon flashlight laser sight from an online seller for MALANGA.

cc. On or about April 10, 2024, MALANGA possessed and carried an "XDE Smith & Weason" [sic] .45 caliber firearm from the United States to Africa.

dd. On or about April 10, 2024, THOMPSON possessed and carried a 1911 Firestorm .45 caliber firearm from the United States to Africa. MOESSER was the original purchaser of this firearm.

ee. On or about April 10, 2024, MALANGA and THOMPSON traveled from Utah to Africa with the DJI S1000 drone, the TF-19 Wasp Flamethrower attachment, and the DJI Mavic 2 drone.

ff. On or about April 13, 2024, MALANGA and THOMPSON engaged in firearms training in Africa with an AR-15 rifle and a Glock 17 9mm handgun.

gg. On or about April 23, 2024, THOMPSON searched online for "blunderbuss gun powder nearby."

hh. On or about May 1, 2024, while in Africa, MALANGA purchased four items from an online seller, including a battery charger, an adapter plug for a battery charger, a

drone speaker/microphone, and a GoPro camera, and MALANGA had them shipped on the next day to an address in Draper, Utah.[2]

**COUNT 1**
**18 U.S.C. § 2339A**
**Conspiracy to Provide Material Support and Resources**

Beginning on a date unknown but no later than July of 2023, and continuing through on or about May 19, 2024, in the District of Utah and elsewhere, including the Democratic Republic of the Congo, the defendants,

MARCEL MALU MALANGA,
TYLER CHRISTIAN THOMPSON, JR.,
BENJAMIN REUBEN ZALMAN-POLUN, and
JOSEPH PETER MOESSER

conspired and agreed with each other and other persons known and unknown to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b)(1), including property, services, training, expert advice and assistance, communications equipment, weapons, explosives, personnel, including themselves, and transportation, knowing and intending that they were to be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956 (conspiracy to commit at a place outside the United States an act that would constitute the offense of murder, if committed in the special maritime and territorial jurisdiction of the United States, where one of the conspirators committed an act within the jurisdiction of the United States to effect an object of the conspiracy), all in violation of 18 U.S.C § 2339A.

[2] It is believed that a family member later sent these items from Utah to MALANGA in Africa.

Case 2:25-mj-00346-DBP Document 1-2 Filed 04/07/25 Page 10 of 12

**<u>COUNT 2</u>**
**18 U.S.C. § 2332a(b)**
**Conspiracy to Use Weapons of Mass Destruction**

Beginning on a date unknown but no later than July of 2023, and continuing through on or about May 19, 2024, in the District of Utah and elsewhere, including the Democratic Republic of the Congo, the defendants,

MARCEL MALU MALANGA,
TYLER CHRISTIAN THOMPSON, JR.,
BENJAMIN REUBEN ZALMAN-POLUN, and
JOSEPH PETER MOESSER

who are United States nationals, knowingly conspired and agreed with each other and other persons known and unknown to use a weapon of mass destruction, to wit, destructive devices, a commercially available incendiary device, and the integration of these devices with a drone delivery vehicle, outside the United States, all in violation of 18 U.S.C. § 2332a(b).

**<u>COUNT 3</u>**
**18 U.S.C. § 2332f(a)(2)**
**Conspiracy to Bomb Places of Public Use, Government Facilities,**
**Public Transportation Systems and Infrastructure Facilities**

Beginning on a date unknown but no later than July of 2023, and continuing through on or about May 19, 2024, in the District of Utah and elsewhere, including the Democratic Republic of the Congo, the defendants,

MARCEL MALU MALANGA,
TYLER CHRISTIAN THOMPSON, JR.,
BENJAMIN REUBEN ZALMAN-POLUN, and
JOSEPH PETER MOESSER

who are United States nationals, conspired to knowingly and unlawfully deliver, place, discharge, and detonate an explosive or other lethal device, to wit, destructive devices, a commercially available incendiary device, and the integration of these devices with a drone

delivery vehicle, in, into, or against a state or government facility, to wit, the Palais de la Nation in the Democratic Republic of the Congo, outside of the United States, with the intent to cause death or serious bodily injury, all in violation of 18 U.S.C. § 2332f(a)(2).

**COUNT 4**
**18 U.S.C. § 956**
**Conspiracy to Kill or Kidnap Persons in a Foreign Country**

Beginning on a date unknown but no later than July of 2023, and continuing through on or about May 19, 2024, in the District of Utah and elsewhere, including the Democratic Republic of the Congo, the defendants,

MARCEL MALU MALANGA,
TYLER CHRISTIAN THOMPSON, JR.,
BENJAMIN REUBEN ZALMAN-POLUN, and
JOSEPH PETER MOESSER

knowingly conspired and agreed with each other, and others known and unknown to the United States Attorney, to commit at any place outside the United States an act that would constitute the offense of murder and kidnapping if committed in the special maritime and territorial jurisdiction of the United States, and in so doing, committed an act within the jurisdiction of the United States to effect any object of the conspiracy, and

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants MALANGA, THOMPSON, POLUN, MOESSER, and other conspirators known and unknown committed overt acts, including those alleged in paragraph 6, incorporated herein by reference, all in violation of 18 U.S.C. § 956(a).

**<u>COUNT 5</u>**
**18 U.S.C. § 924(k)(2)**
**Taking a Firearm Out of The United States to Engage in a Felony**

On or about April 10, 2024, in the District of Utah and elsewhere, including the Democratic Republic of the Congo, the defendant,

MARCEL MALU MALANGA,

did knowingly take out of the United States a firearm, that is, an "XDE Smith & Weason [sic] .45 He116508," with intent to engage in or to promote conduct that constitutes a felony, that is an offense punishable by imprisonment for a term exceeding one year, all in violation of 18 U.S.C.§ 924(k)(2).

**<u>COUNT 6</u>**
**18 U.S.C. § 924(k)(2)**
**Taking a Firearm Out of The United States to Engage in a Felony**

On or about April 10, 2024, in the District of Utah and elsewhere, including the Democratic Republic of the Congo, the defendant,

TYLER CHRISTIAN THOMPSON, JR.,

did knowingly take out of the United States a firearm, that is, a 1911 Firestorm .45 caliber firearm, with intent to engage in or to promote conduct that constitutes a felony, that is an offense punishable by imprisonment for a term exceeding one year, all in violation of 18 U.S.C. § 924(k)(2).

**<u>AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT</u>**

This complaint is made on the basis of investigation consisting of the following:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have

been in this position since September 2006. In my duties as a Special Agent, I investigate among other things, National Security cases relating to international terrorism. Currently, I am assigned to the Salt Lake City Division. As such, I am an “investigative or law enforcement officer” of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested Criminal Complaint and arrest warrants, and does not set forth all my knowledge, or the knowledge of others, about this matter.

***Overall Summary***

3. On or about May 19, 2024, a coup d’état took place in the Democratic Republic of the Congo (“DRC”). The rebel forces targeted Congolese President Félix Tshisekedi and his Deputy Prime Minister for the Economy Vital Kamerhe (“Kamerhe”), attacking both the Palais de la Nation (the official residence and principal workplace of the president) and Kamerhe’s private residence in Kinshasa, DRC. Men wearing camouflage fatigues and armed with weapons attacked and entered the Palais de la Nation. Armed men also attacked Kamerhe’s residence, which was riddled with bullet holes after the attack. At least six people died during the attack, including Christian, two police officers protecting Kamerhe’s residence, and at least one innocent civilian. The goal of these rebel forces was to overthrow the DRC government, establish a new government known as the New Zaire, and install Christian as the president of the New Zaire.

4. The rebel forces video recorded and livestreamed the attack on social media. During two of those video recordings, Christian, surrounded with his rebel army, was speaking and yelled, “I know one thing, Felix you’re out…we’re coming for you,” and in the other video, he states, “Felix, we’re coming for you.”

5. The defendants, and members of the conspiracy, took extensive steps to plan, organize, prepare, recruit, provide material support, and to lead the rebel forces in carrying out the attacks. Their criminal enterprise took place in the United States, South Africa, the DRC, and elsewhere.

***Christian Malanga***

6. Christian was a 41-year-old native and citizen of the DRC. He moved to the United States in or about 1998, established a residence in Salt Lake City, Utah, and obtained U.S. lawful permanent resident status. He had at least one son, MALANGA, while living in Utah. Christian returned to the DRC in or about 2006, where he enlisted in the DRC military and became politically active. He became the leader of the United Congolese Party, and in or about 2017, established the “New Zaire Government in Exile” and proclaimed himself its president. He is believed to be a leader of the coup on or about May 19, 2024, in Kinshasa, DRC, where he was shot and killed by DRC security forces.

***Marcel Malanga***

7. MALANGA is a 22-year-old native and citizen of the United States. He resided in West Jordan, Utah, prior to traveling to Africa in or about April 2024. According to Person #5, MALANGA resided with THOMPSON at THOMPSON’s parents’ residence from in or about January through April 2024. According to Person #7, MALANGA grew closer to Christian when he took a trip with MALANGA and Person #7’s father to visit Christian in Africa in or about

November 2022. MALANGA can be seen wearing a military-style uniform like his father's uniform in the undated picture below, which was posted to Christian's Social Media Platform #2 on January 6, 2024[3] with the hashtag #newzaire.



[3] Although the picture was posted to Christian's Social Media Platform #2 account on January 6, 2024, and the location says the person making the post was in Kinshasa, DRC, at the time, the actual date and geographic location of when and where the photograph was taken is unclear to the FBI. Regardless, based on the investigation to date, MALANGA was in the United States in January 2024, and not in the DRC.

Case 1:25-mj-01346-DBP Document 1-2 Filed 04/05/25 Page 16 of 82

8. On MALANGA's Social Media Platform #3 account he posted many pictures of firearms, including assault rifles, where he indicated he may be preparing for a war. In the posts he labeled the photos, "some more war", "war," "more war," and "war ready," pictured below.












9. MALANGA joined the conspiracy to overthrow the DRC government and to provide material support and resources to the rebel army by contributing personnel (himself), services, recruiting of others, equipment, weapons, and explosive and incendiary devices (destructive device(s)).

***Tyler Thompson***

10. THOMPSON is a 22-year-old native and citizen of the United States. He resided in West Jordan, Utah, prior to traveling to Africa in or about April 2024. THOMPSON and MALANGA were friends, high school classmates, football teammates, and they worked together.

11. THOMPSON's role, among other things, was to operate and facilitate drone support during the Armed Coup Attack.

12. THOMPSON joined the conspiracy to overthrow the DRC government and provided material support and resources to the rebel army by contributing personnel (himself), property, expert advice related to drones, weapon(s), and explosive and incendiary devices (destructive device(s)).

***Benjamin Zalman-Polun***

13. POLUN is a 37-year-old native and citizen of the United States. Over the past 11 years, POLUN has resided in Virginia, Nicaragua, England, Belgium, Republic of Georgia, Senegal, and Eswatini. While POLUN's family resided in Eswatini, POLUN took multiple trips to Utah between 2023 and 2024.

14. Person #8 stated that everything Christian and POLUN did was "a means to an end to make Christian the president of the DRC." Person #8 told investigators that, according to POLUN, if Christian was successful in becoming the president of the DRC, POLUN would

Case 2:25-mj-00346-DBP Document 2 Filed 04/05/25 PageID.100 Page 18 of 82

remain his "chief of staff" or he would "work in finance" in Christian's new administration.

15. Person #8 further told investigators that POLUN left Eswatini in approximately January 2024, and that he was in Utah from approximately February 2024 to March 2024 working a construction job building houses with MALANGA.

16. POLUN joined the conspiracy to overthrow the DRC government and provided material support and resources to the rebel army by contributing personnel (himself), services, recruiting of others, weapons, and explosive and incendiary devices (destructive device(s)).

***Joseph Peter Moesser***

17. MOESSER is a 67-year-old native and citizen of the United States. He resides in West Valley City, Utah. He appears to have had a long-standing relationship with Christian.

18. MOESSER's role, among other things, was to design, manufacture, and provide assembly instructions for destructive devices. He also intended to provide sniper support during the attack.

19. MOESSER joined the conspiracy to overthrow the DRC government and provided material support and resources to the rebel army by contributing, services, equipment, firearms, expert advice and training related to explosives and incendiary devices (destructive devices), and personnel (himself).

***MALANGA and POLUN Recruited and Attempted to Recruit Others to Join the Conspiracy and to Fight with the Rebel Forces***

20. MALANGA and POLUN both attempted to directly and indirectly recruit others to join the conspiracy to fight with their rebel army. The FBI interviewed one of MALANGA's close friends, Person #2. Person #2 discussed an encounter he had with MALANGA and POLUN in early 2024. Person #2 stated that MALANGA video called him after Person #2 exited a

college class in Utah. At the time, MALANGA was in Utah and had just picked up POLUN from the Salt Lake City International Airport. MALANGA introduced POLUN as his father's "Chief of Staff." According to Person #2, during the video call MALANGA offered $50,000 to Person #2 to go to Africa with the intent of going to a home to "invade it." MALANGA and POLUN tried to recruit Person #2 to join their rebel army to "get everyone ready for arresting the Secretary of Defense" and to "raid the premises."

21. Later that same week, POLUN and MALANGA met with Person #2 at a restaurant in West Jordan, Utah. During this meeting, POLUN told Person #2 that, in the DRC, cops are destroying markets and women are being raped. POLUN told Person #2 they would travel to the DRC and take over the presidential palace. POLUN claimed they would be on live television, people would be cheering for them, and they would be "heroes." Person #2 told the FBI that he believed this sounded like a movie. Person #2 asked POLUN if he would be given a gun, and POLUN or MALANGA responded that he would be issued a weapon in the DRC once he got there. MALANGA told Person #2 that THOMPSON got his passport already and that POLUN could expedite Person #2's passport.

22. Person #9 became friends with MALANGA in 2021 through a mutual friend (Person #10). Another close member of their friend group was Person #2. MALANGA invited Person #9 to travel with him to Africa.

23. Sometime after MALANGA had invited Person #9 to Africa, Person #2 brought up what MALANGA had said about the purpose for going to Africa that, "we're about to go take out some terrorists," like "Call of Duty stuff." Person #9 said that MALANGA never offered him any money to try to get him to go to Africa.

24. Person #9 became worried about MALANGA's plans and personal safety in

Africa. Person #9 had a friend who was a former U.S. Army Ranger who did contract work. Given that MALANGA was going to be engaging in potentially violent activity in a foreign country, Person #9 thought it would be a good idea to recommend that MALANGA talk to this former Army Ranger. MALANGA told Person #9 that he did not want to talk to the Army Ranger, saying, "I'm straight bro, we're good." A few days later, MALANGA and Person #9 were together at a football practice where Person #9 again told MALANGA he should talk to the Army Ranger, saying MALANGA's life was on the line. MALANGA refused the offer. Person #9 stated that he was really disappointed because he was worried about MALANGA's safety and thought the Army Ranger might have some professional contacts who could help him.

25. MALANGA also recruited other friends to travel to Africa with him, but in some cases his offer appeared to be less specific or direct. The FBI interviewed MALANGA's friend, Person #1, who told investigators that he and MALANGA were "hanging out" together in the summer of 2023 in Utah, and that MALANGA had talked to him about traveling to Africa to do "Secret Service" work for Christian. Person #1 initially agreed to make the trip, but he changed his mind during September or October 2023. The two "hung out" together again on February 27, 2024, in Utah, and Person #1 loaned MALANGA his snowboard pants. Two days later, on February 29, 2024, Person #1 stated that he viewed a Social Media Platform #1 post from MALANGA with the following photo of MALANGA and the caption, "If you want to make $50-100k message me (warriors only)."




26. Furthermore, Person #4 also told the FBI that MALANGA had indirectly hinted about Person #4 coming to Africa and that MALANGA could help pay for the trip. Person #4 stated that he knew THOMPSON was getting most of his trip paid for by MALANGA. Person #4 also stated that he knew MALANGA's dad was a president of an African country (though he was unsure exactly which country, only that it was above South Africa). Person #4 stated that he, too, had seen MALANGA's post on Social Media Platform #1, where MALANGA was soliciting others to join him in Africa stating, "If you want to make $50-100k message me (warriors only)."

27. The FBI also interviewed Person #6, another one of MALANGA's friends. Person #6 told investigators that he spoke to MALANGA approximately two weeks before MALANGA left for Africa. This conversation between MALANGA and Person #6 took place in approximately March 2024, based upon MALANGA's departure for Africa in April 2024. Person #6 told investigators he also spoke to MALANGA and THOMPSON in April via video call on Social Media Platform #1, while MALANGA and THOMPSON were together in Africa.

During this video call, MALANGA invited Person #6 to travel to Africa to help provide security while MALANGA ran a business in Africa. At the time, Person #6 perceived that MALANGA might be joking with him. Person #6 declined to travel because he did not have a passport. MALANGA then told Person #6 that there was a way to get an expedited passport if he wanted to travel there. Person #6 again declined.

28. Person #6 also stated Person #11 was friends with MALANGA. Person #6 stated that Person #11 had told him that MALANGA had also invited him [Person #11] to travel to Africa. Person #6 stated that after the Armed Coup Attack had happened, both Person #6 and Person #11 were talking together about the Armed Coup Attack. Person #6 said that both were shocked and relieved that they did not go to Africa with MALANGA. Person #11, however, has denied to the FBI that he had any previous knowledge of MALANGA's plans to go to Africa.

***MALANGA and THOMPSON Obtained and Equipped an Aerial Drone with the Intent to Use it to Deliver Destructive Devices and to Carry an Incendiary Device***

29. MALANGA and THOMPSON acquired a DJI S1000 drone while in the United States prior to departing for Africa in April 2024. As explained below, they took the drone with them to Africa. MALANGA and THOMPSON intended to use the drone to deliver destructive devices by retrofitting it with a dropping/release mechanism to enable it to drop bombs/explosives during the Armed Coup Attack. They further intended to attach a flamethrower to the drone so they could light people on fire.

30. The FBI interviewed Person #12, who knows THOMPSON well. Person #12 said that MALANGA was living with THOMPSON in THOMPSON's bedroom at his mother's residence in Salt Lake County, Utah, prior to their 2024 departure to Africa. The FBI conducted a lawful search of THOMPSON's bedroom on May 29, 2024. Agents found, among other items,

Case 2:25-mj-00130-DBP Document 1 Filed 04/05/25 PageID.23 Page 23 of 83

a Spirit Airlines boarding pass and a checked bag tag for MALANGA. The boarding pass contained flight information for a flight from Los Angeles, California, to Salt Lake City, Utah, on March 12, 2024. Agents asked Person #12 if he/she knew anything about the trip to California, and Person #12 told agents that MALANGA flew to Los Angeles, California to purchase a large drone as requested by Christian.

31. Additionally, the FBI conducted a lawful search of MALANGA's email account. In reviewing MALANGA's emails, it appears that MALANGA purchased a DJI S1000 drone from Person #3 in March 2024. Specifically, the email account shows that MALANGA flew to Los Angeles, California from Salt Lake City, Utah on or about March 12, 2024, with the intent to meet Person #3 and to test fly the drone at a public park located in Studio City, California.

32. On March 19, 2025, the FBI interviewed Person #3, who provided a Bill of Sale confirming MALANGA purchased a DJI S1000 drone on March 12, 2024, for $1,950 in cash. MALANGA also purchased five or six batteries and a stabilizer mount. Person #3 offered to let MALANGA test fly the drone at a park. MALANGA declined, stating that he had a "partner" who would be doing the flying. MALANGA also asked Person #3 what the payload capacity was for the drone, and Person #3 indicated it was approximately 15 pounds, and that it needed two people to properly operate it.

33. On or about March 12, 2024, THOMPSON and Person #4 drove to the Salt Lake City International Airport and picked up the DJI S1000 drone purchased by MALANGA in Los Angeles.

34. Person #2 provided the FBI with a video of MALANGA and THOMPSON working on a large drone at MOESSER's house that, according to Person #2, MALANGA was "trying to put a flamethrower on." Person #2 identified MALANGA and THOMPSON in the

video, and at one point MALANGA stated, "Tyler, hold that down please." Person #2 identified the person on the left as MALANGA and the person on the right as THOMPSON. The following are screenshots from the video which depicts MALANGA, THOMPSON, the drone, and the flamethrower referenced by Person #2.





35. A drone, similar in appearance to the one from the video provided by Person #2, was depicted in media footage following the Armed Coup Attack as evidence recovered by DRC security forces during or immediately following the Armed Coup Attack. The following is a screenshot of a video uploaded to YouTube[4] shortly after the Armed Coup Attack took place depicting the drone. Person #5 stated he saw THOMPSON and MALANGA with this drone in Utah prior to their departure to Africa.

36. The FBI obtained an email sent by THOMPSON to Person #13 on March 12, 2024, pursuant to a lawful search. In the email, THOMPSON wrote, "hello, im reaching out on behalf of Christian malanga. we are interested in purchasing your tf-19 attachment for 1499. I was told you do not accept cash, I was wondering how you accept payment?" Additionally, the

[4] YouTube video downloaded and captured by the FBI on May 21, 2024, from https://www.youtu.be/yi7LilEbPGE?si=-RT8oPVaMuSC417k.

investigation has shown that on or about March 13, 2024, MALANGA communicated via email with Person #13, an employee of a U.S.-based vendor of flamethrower attachments. MALANGA was located in the United States at this time, in March 2024. MALANGA exchanged multiple emails with Person #13 in March and April 2024, which was prior to MALANGA's final departure to Africa. In response to legal process served on Person #13, their business records show that MALANGA purchased a TF-19 Wasp Flamethrower drone attachment on March 22, 2024, for $1,499.00.



37. The seller's website describes the TF-19 Wasp Flamethrower attachment as "a drone flamethrower attachment designed for remote ignition of aerial and ground targets, bringing new levels of efficiency and manageability to agriculture." Additionally, MALANGA asked Person #13 for a "video or pdf file that walks you through adding the attachment into a djis1000, we also noticed tf19 male piece does not match with the female adapter of the s1000 do you know where I could purchase an adapter for it?" On March 27, 2024, Person #13 responded to MALANGA and included a diagram and specification sheet. The following is a picture of a TF-19 Wasp Flamethrower drone attachment, captured from Person #13's website.



38. The picture below, obtained from MALANGA's data storage account, shows MALANGA and THOMPSON's luggage stacked in what appears to be the front room of THOMPSON's residence, located in Utah. The file details indicate this photo was taken on April 10, 2024, which is the same day they departed for Africa. Based upon the FBI's investigation, I believe the taller cardboard box leaning against the wall and circled in red is the flamethrower. Indeed, as is depicted later in this Complaint, THOMPSON is seen in a video removing the flamethrower from what appears to be the same box in a room in Johannesburg, South Africa.



39. THOMPSON also took steps to further assist in enabling a drone to carry destructive and incendiary devices. Specifically, THOMPSON's data storage account revealed that THOMPSON made many searches for devices that could be attached to the drone to carry a payload and then to release or drop the payload from the air.

40. On or about February 29, 2024, THOMPSON searched online for "drones that can carry and drop things." On or about March 2, 2024, he searched online for "heavy lift drones." On or about March 30, 2024, THOMPSON visited "[online seller]: Air 2S Airdrop Payload Delivery Device, Drone Fishing Line Release and Drop Device for DJI Mavic Air 2/Air 2S Accessories: Toys & Games." On the same day he visited "[online seller]: dji mavic 3 pro payload release system." The significance of the drone dropping mechanism is important, and is discussed in more detail below, because it enables a drone to carry and drop destructive devices

during the Armed Coup Attack.

41. Moreover, on or about March 5, 2024, a review of MALANGA's data storage account shows that he was searching for a drone dropping device. MALANGA visited an online retailer and found a dropping device for the DJI 200. It was listed for sale for $843.44. An image[5] is included below.




42. Additionally, on or about March 7, 2024, the FBI interviewed Person #5. Person #5 stated that he had purchased a drone dropping mechanism and a 500-lumen tactical weapon flashlight laser sight from an online seller for MALANGA. MALANGA's data storage account also contained a photograph taken on or about March 13, 2024, of what appears to be a drone dropping mechanism.

[5] The original image was in French. Google Translate was used on the image to translate it into English.



43. The FBI also learned that MALANGA and THOMPSON acquired a second drone to use during the attack. Person #12 showed agents a video on his/her laptop of this second drone which MALANGA and THOMPSON acquired before their April 2024 departure for Africa. THOMPSON is the only person seen or heard in the video. It appears to agents to be a self-recorded video of THOMPSON describing the drone as a DJI Mavic 2. Person #12 stated this video was recorded at THOMPSON's Utah residence. In the video, THOMPSON indicated the date was March 2, 2024, and he stated, "Behind me is something that I have been manifesting for an extremely long time, but I haven't been able to afford it, but an opportunity to get access to one happened to fall into my lap." The video then shows a drone and a drone remote control. Below are two screenshots from the video made by THOMPSON.






44. Person #12 told the agents that this video was taken by THOMPSON. According to Person #12, MALANGA and THOMPSON took these two drones with them to Africa when they departed on or around April 10, 2024.

***MALANGA Inquires about Ordering Military-Style Patches***

45. The FBI's review of MALANGA's email shows an email exchange between MALANGA and Person #14, the owner of a U.S. based company, which is a custom wholesale

Case 2:25-mj-00134-DBP Document 2 Filed 04/05/25 PageID.113 Page 31 of 82

velcro patch supplier located in Utah. Person #14 provided the FBI with an email message received from MALANGA on or about March 29, 2024. In his message, MALANGA requested "25 custom military patches done by you guys, I am also located in Utah." The message also included a digital picture of the desired custom patch, which appears to be a replica of the flag of Zaire. The flag of Zaire was the national flag for the Republic of Zaire, which was the name of the DRC between 1971-1997. Included below is a screenshot of the email between MALANGA and Person #14.

**From:** Marcel Malanga <marcelmalanga@yahoo.com>
**Sent:** Friday, March 29, 2024 7:16 PM
[redacted]
**Subject:** Custom patches

Hello I am interested in getting 25 custom military patches done by you guys, I am also located in Utah



this is the flag patch I would like made
Sent from my iPhone

46. Videos obtained pursuant to a lawful search of Christian's Social Media Platform #2 account depict Christian and other unidentified members of his rebel force inside the Palais de la Nation hoisting the flag of the New Zaire. The screenshot below depicts Christian holding the flag of the New Zaire.



47. A screenshot of MALANGA during the attack shows on his left arm what appears to be a New Zaire patch.



Case 1:25-mj-00296-AEM Document 1-4 Filed 04/05/25 Page 33 of 84

***MALANGA Attempts to Acquire Bombs (Hornet Drones) from Person #15***

48. MALANGA attempted to acquire bombs for his "military" to use during their "war" against the DRC. Pursuant to a court authorized search, the FBI obtained information from MALANGA's account on Social Media Platform #3. A review of the materials in MALANGA's account on Social Media Platform #3 include a conversation between MALANGA and Person #15. Images sent to MALANGA by Person #15 indicate that Person #15 is working with the Ukrainian military. MALANGA and Person #15 began communicating on July 26, 2023, when MALANGA contacted Person #15 on Social Media Platform #3, with the message, "Hello sir. I have a couple questions." Person #15 replied, "hello) I listen to you." Below are excerpts of their messages found on Social Media Platform #3 from July 26, 2023.

> MALANGA: Hello sir my name is Marcel Malanga chief of staff of the Zaire army. I am son of Christian Malanga whom is president of The Democratic Republic Congo. We are currently fighting a war as well in my country congo, I am reaching out in regards of your Hornet Drones… my military and I are very interested in knowing more information about them.
>
> Person #15: what information do you need ?
>
> MALANGA: Whom is Manufacturing these ? Where do you get them from, I am looking to get ahold of these hornets as-well for my platoons. I see that they are very important and helpful with saving soldiers lives. For my people are fighting a very similar war right now
>
> Person #15: this is classified information but I could advise and train you) for money
>
> MALANGA: Okay I understand, that is definitely something that my military team and I would be interested in…
>
> Person #15: let's negotiate.
>
> MALANGA: When you do you mean by train and advise? What services are you offering to me and my people that will be effective

Case 2:25-mj-00134-DBP Document 1 Filed 04/05/25 PageID.116 Page 34 of 125

in helping us in our battle?

Person #15: infantry tactics of Russians and Ukrainians) tactics of small groups, the use of drones, artillery and equipment. I have extensive experience in urban battles and in forests and fields. I was trained by special forces officers and elite NATO troops.

Person #15 followed this last comment with three photographs of what appear to be Ukrainian servicemen standing with military vehicles and firearms.

49. On February 2, 2024, the following exchange took place between MALANGA and Person #15 via Social Media Platform #3,:

MALANGA: Hey sir where were you guys getting the fpv drones ? And shells used for air strikes

Person #15: bought

MALANGA: Are you able to direct me so I can purchase

Person #15: China

MALANGA: The hornets And I am in need of the 3d printed shells

Person #15: we have

MALANGA: How could I purchase or could you show me how to make them w our printer

Person #15: come to Ukraine, we'll agree)

MALANGA: I am currently not in a position where I can leave my country, I am in Congo with my team how could we make this work.. you have a lot of knowledge I would love to acquire with the drones and rpg shells

Person #15: online training?

MALANGA: Yes if possible that would be great

50. On February 4, 2024, MALANGA and Person #15 continued to communicate via Social Media Platform #3 as follows:

MALANGA: How could we go about this online training ? What would consist of it? [MALANGA then sent a video clip with a url from [Social Media Platform3]. The text of the video is in Ukrainian, and it says the video shows the production of a hornet drone.] I am looking for these aswell

Person #15: yes, but you need practice)

51. On March 2, 2024, MALANGA contacted Person #15 again via Social Media Platform #3 and the two communicated as follows:

MALANGA: Sir my team and I would like to buy the 🥔 shells from you

Person #15: shells? What is it ?

MALANGA: The 3d printed canister/shells

MALANGA then sent the following five images to Person #15 via Social Media Platform #3.




3D printing for Ukraine - activists print shanks for ukrainian ...
Share
SAVVAĻAS
BITES
1000
1500
Ukraiņus atbalsta izgatavojot sprāgstvielu "astītes"
PANORĀMA
Palestīniešu kaujinieki Gazas joslā izšāvuši raķetes pret Jeruzalemi
YouTube


A vog a day
keeps the pests
AWAY
TAIL V2
Amazon
Delivery
Repellant





Case 2:25-mj-01346-DBP Document 1-2 Filed 04/05/25 PageID.120 Page 38 of 42

After MALANGA sent the above images, their communications on Social Media Platform #3 continued as follows.

Person #15: yes, I have this

MALANGA: Perfect, my team and I are interested in purchasing

Person #15: How many do you need?

MALANGA: Looking for 50-100

Person #15: no problem. how much money are you willing to pay?

MALANGA: How much per shell?

Person #15: 30$ + delivery

MALANGA: Or purchase the file so my team and I can start making them here ourselves. $30 per unit/shell?

Person #15: it will be expensive. 30$ for one piece

MALANGA: Okay , what size does the conclude for

Person #15: I have 3-4 types, for different ammunition) I can send 20-30 pieces to each

MALANGA: Amazing, do you have the release mechanism aswell that attaches to the drone

Person #15: That's all I wanted to say!

MALANGA: Do you have [encrypted online communication application] so we can talk there ?

Person #15: +*********304

MALANGA: Perfect I reached out

52. Person #15 then liked MALANGA's message. This was their final communication on Social Media Platform #3. Based on these communications, it appears MALANGA then transitioned from Social Media Platform #3 to an encrypted online

communication application to continue communicating with Person #15 regarding the acquisition, production, and or training for “Hornet Drones,” “fpv drones,” “3d printed cannister/shells,” and “rpg shells.” I know from my training and experience that encrypted online communication applications are often used by individuals to conduct criminal activity because they believe that law enforcement is unable to intercept their communications.

53. On or about March 9, 2024, it appears that MALANGA paid Person #15 for explosive devices. In a screenshot that was saved by MALANGA in his data storage account, there appear to be encrypted online communication application messages between Person #15 and MALANGA. MALANGA tells Person #15 that he has “sent you over the funds for the fee that you were asking for. hopefully we may progress and I can equip shells from you.” Person #15 tells MALANGA “Okay, I’m collecting your order) and ready to ship in a couple of days.”

***The Rebel Army Acquires and Attempts to Acquire Destructive Devices from a Second Source to Use During the Attack***

54. MALANGA, POLUN, and THOMPSON, each took substantial steps to further the goals of the conspiracy by acquiring or attempting to acquire destructive devices from MOESSER to be used during the Armed Coup Attack. The coconspirators utilized MOESSER’s expertise to design and manufacture destructive devices intended for drone delivery.

55. MOESSER served as a manufacturer, distributor, and instructor for destructive devices. He provided material support to the conspiracy and the rebel army, including providing weapons of mass destruction and expertise about how to construct and use these explosive and incendiary devices. These devices were intended for use during the planned Armed Coup Attack against DRC government officials, DRC military, and DRC government buildings including the Palais de la Nation (which has a similar function to the White House in the United States). These devices were intended to be used by the rebel army to cause serious bodily injury and death.

Case 2:25-mj-00346-DBP Document 2 Filed 04/05/25 Page 40 of 121 PageID.

56. On or about October 15, 2023, Christian messaged MOESSER about shipping things to the DRC because he and his team would "be ready for change in DRC." MOESSER asked if Christian was talking about the "CONGO SPECIAL" and how many of them Christian needed. Christian responded, "Yes, Pete the Congo special." MOESSER then messaged Christian asking how he could get them in his hands.




57. Sometime prior to February 25, 2024, Christian sent MOESSER a message stating in part, "for supporting the liberation of my people. See you soon!" On or about February 25, 2024, MOESSER responded, "okay I can do that. just let me know when." The following

Friday March 1, 2024, MOESSER sent a message to Christian, indicating that he had met with POLUN and MALANGA several days earlier. MOESSER offered to sell Christian some of his machines and to ship the items to "the Congo." He also said he was working on the prototype of two units for Christian. On or about March 3, 2024, Christian told MOESSER, "I look forward to following out our plan together we discussed many times. Now is the time for change. Please do not hesitate to ask me any questions. I look forward to seeing you."







58. On or about February 29, 2024, MALANGA added a ".txt" note to his data storage account which said:

> "Amoniam nitrate ifa
> 50/20 aluminum"

Case 2:25-mj-00346-DBP Document 1 Filed 04/05/25 PageID.42 Page 42 of 85

On March 25, 2025, an FBI chemist who completed a preliminary review of this evidence opined that, when mixed appropriately, ammonium nitrate and aluminum powder can form an explosive mixture.

59. A review of MALANGA's data storage account shows an invoice that appears to be sent to POLUN for payment. It is an invoice for, among other things, explosive devices. As discussed more below, MALANGA and THOMPSON appear to have acquired the gun powder upon reaching Africa. The invoice reads as follows:

Bill to: Ben
Ship: 3/6/2024

- 7.62 barrels/quantity 10/price each 150.00/amount 1,500.00
- Lower receivers for AR-15/quantity 10/price each 250.00/amount 2500.00
- Collapsible stock/quantity 10/price each 85.00/amount 850.00
- Forearm with pickany mounts/quantity 10/price each 60.00/amount 600.00
- LOUD ITEM DOES NOT INCLUDE GUN POWDER/quantity 25/price each 36.00/amount 900.00
- EXPLOSIVE DEVICE DOES NOT INCLUDE GUN POWDER/quantity 25/price each 40.00/amount 1,000.00
- NOTICE: THIS DOES NOT INCLUDE SHIPPING, HOPEFULLY YOU CAN TAKE CARE OF THAT

Total: $7350.00

A photo from MALANGA's data storage account shows that the image of the invoice was taken on or about March 7, 2024. A screenshot of the invoice is below.

Case 1:25-mj-01396-JDB Document 2 Filed 04/05/25 Page 43 of 124



Log Haven Stay 2

**Invoice**

| Date | Invoice # |
|---|---|
| 3/6/2024 | 137 |

Bill To
Ben

Ship To

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| | | | 3/6/2024 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 10 | item | 7.62 barrels | 150.00 | 1,500.00 |
| 10 | item | lower receivers for AR-15 | 250.00 | 2,500.00 |
| 10 | item | collapsible stock | 85.00 | 850.00 |
| 10 | item | forearm with pickany mounts | 60.00 | 600.00 |
| 25 | item | LOUD ITEM DOES NOT INCLUDE GUN POWDER | 36.00 | 900.00 |
| 25 | item | EXPLOSIVE DEVICE DOES NOT INCLUDE GUN POWDER | 40.00 | 1,000.00 |
| | NOTICE | THIS DOES NOT INCLUDE SHIPPING. HOPEFULLY YOU CAN TAKE CARE OF THAT | 0.00 | 0.00 |

**Total** $7,350.00

60. On or about April 8, 2024, MALANGA recorded a video of a discussion between himself and MOESSER. This video portrays MOESSER and MALANGA discussing the triggering mechanism that would be activated when a destructive device hits the ground. MOESSER told MALANGA that he had tested one of the devices by hitting it with a hammer and it "blew up." MALANGA explained to MOESSER that the bomb would be dropped from around 50 to 100 feet in the air and would reach maximum velocity.

61. Moreover, when discussing the below pictured destructive device, MOESSER tells MALANGA that the plastic ones are "still going to blow up." MALANGA says, "just without shrapnel though…," and MOESSER responds, "Yeah, there will be shrapnel in there." MALANGA then responds, "Perfect. That's amazing." Several screenshots of the video recording are included below. The individual depicted in the first two screenshots is believed to be MOESSER sitting in his Utah residence.



Case 2:25-mj-00346-DBP Document 12 Filed 04/05/25 PageID.412 Page 45 of 82



62. In another video recording on the same day, MALANGA and MOESSER are sitting around the table with the flamethrower and DJI S1000 drone while discussing how they are going to ship the explosives part by part via DHL. MOESSER states that he needs 209 primers. MALANGA says he will source that in "Joburg." Investigators understand "Joburg" to refer to Johannesburg, South Africa. MOESSER then states that he does not want to ship the devices with the primers in them. MOESSER says he plans on putting the components together there.

63. On or about March 24, 2025, an FBI explosives expert who completed a preliminary review of the evidence opined that if the Improvised Explosive Device ("IED") components shown in digital evidence were completed and fully assembled, they would result in multiple destructive devices. Specifically, the adaptation of a drone to act as a delivery

Case 1:25-mj-00346-JMP Document 1-2 Page 46 of 106

mechanism to drop pipe bombs designed with improvised impact fuzes demonstrates weaponization characteristics. Additionally, the use of hardened containers such as steel and PVC pipe for the construction of IEDs demonstrates weaponization characteristics due to the enhanced fragmentation effect that those materials would create. When properly assembled and initiated, destructive devices are capable of causing personal injury and/or death.

64. Person #2 told the FBI that several days before MALANGA and THOMPSON flew out for Africa, MALANGA took Person #2 to MOESSER's home. Person #2 stated that THOMPSON arrived a little later at the house around 4 or 5 in the afternoon. Person #2 heard THOMPSON talk about how he was supposed to pilot the drone. Additionally, while at the home, Person #2 observed MOESSER and MALANGA discussing the pipe bombs they would be dropping from the drone in the DRC. MALANGA asked Person #2 to ship him boxes of the bomb components once MALANGA got to Africa.

65. After arriving in Africa, on or about April 23, 2024, MALANGA was searching Bass Pro Shops for 209 primers, the identical kind of primers MOESSER previously instructed him to acquire for the destructive devices, based upon a lawful search of his data storage account.

Case 2:25-mj-00346-DBP Document 1 Filed 04/05/25 PageID.129 Page 47 of 82




66. On or about April 23, 2024, in Africa, THOMPSON searched online for "blunderbuss gun powder nearby." I know from a review of MALANGA's data storage account photos that on the same day, MALANGA searched for the location of Blunderbuss Gun & Sport located in Johannesburg, South Africa. A screenshot from MALANGA's data storage account is below.




67. Also on the same day, MALANGA had a photo in his data storage account of an individual holding what appears to be Somchem S335, a medium-burning extruded propellant. I know from my training and experience that this is manufactured in South Africa and is a smokeless gunpowder. I also know from my training and experience that this gunpowder could be put into the previously discussed destructive devices to cause them to explode when detonated.




68. The following day, on or about April 24, 2024, there is another video recording in MALANGA's data storage account showing plastic destructive devices that need to be filled with gun powder and fully assembled. The video shows an individual inspecting the bomb parts which include a box of approximately 39 firing pins and large box of PVC endcaps and pipes. Person #2 confirmed to FBI investigators that he obtained these destructive devices from MOESSER as directed by MALANGA. MALANGA also directed Person #2 to ship the boxes to Africa.







69. Based on documentation obtained from MALANGA's data storage account, MALANGA, THOMPSON, and POLUN traveled on the afternoon of April 24, 2024, from Johannesburg, South Africa to Luanda, Angola on Taag Angola Airlines Flight DT 578.

***MALANGA and THOMPSON Trained with Firearms in Utah***

70. Prior to leaving for Africa, MALANGA and THOMPSON spent time training at firearms ranges in the Salt Lake City, Utah area. Person #2 and Person #10, friends of MALANGA, confirmed that MALANGA and THOMPSON trained with firearms. Moreover, MALANGA's Social Media Platform #3 account includes a video about training with firearms. Below is a screenshot of that video which includes the caption "Train2K!ll" and hashtag "#warbaby."




71. On or about March 9, 2024, THOMPSON visited "Shooting Range in Utah | Gun Rentals | Salt Lake City Gun Range" online. He also visited "TNT Guns & Range | Indoor Shooting Range Murray, Utah" online. He also searched "legacy shooting range."

72. The FBI confirmed that MALANGA and THOMPSON trained together at the Legacy Shooting Center in West Jordan, Utah, on or about March 9, 2024. Surveillance footage

from the range shows them training with handguns and rifles. In the below screenshot, THOMPSON appears to be filming MALANGA as he shoots an AR-15 rifle. Two handguns can also be seen in the picture.




73. The following is an additional screenshot posted to MALANGA's Social Media Platform #3 account around the same time period and depicts MALANGA holding a handgun.



Case 2:25-mj-00134-DBP Document 4 Filed 04/09/25 Page 53 of 86

### *MALANGA and THOMPSON Take Firearms Out of the United States to Africa to Use in the Attack*

74. MALANGA and THOMPSON acquired firearms to use during the attack. Both MALANGA and THOMPSON took firearms from the United States to Africa to use during the attack. The investigation revealed that MALANGA had a screenshot in his data storage account from what appears to be MALANGA's account on Social Media Platform 2. That screenshot shows that in or about January 2024, MALANGA messaged MOESSER stating, "Hello Pete how are you, I am Christian malangas son. We met when I was a little kid, just wondering if you still sale [sic] firearms? We should catch up and get dinner!"

75. During the April 8, 2024, meeting at MOESSER's house discussed earlier in this affidavit, Person #2 saw MOESSER show MALANGA a wall of different weapons. According to Person #2, MALANGA asked MOESSER if he could send more weapons and ammunition to Africa. MALANGA asked MOESSER for specific firearms for himself and for his dad, Christian, to which MOESSER responded yes. MOESSER went on to tell MALANGA that he only had certain firearms and ammunition available because he could not get some types into Africa.

76. MALANGA's data storage account photos show MALANGA holding an assault style rifle at what is believed to be MOESSER's Utah residence (see below photograph on the left). The image was taken on or about March 5, 2024, prior to MALANGA departing for Africa. While it is unknown if this actual firearm was used during the attack, MALANGA does use a similar type of rifle during the attack as shown in the photo on the right.




77. Person #2 had a conversation with MOESSER in 2025, where MOESSER told Person #2 that MALANGA got his [MOESSER's] $500 gun. MOESSER said, "I think his dad was going to use it. He probably had it when he got shot." MOESSER further stated, "[] it tears you up. Thinking if I would have been there if it would have made a difference, cause I probably would be dead but, cause I had the sniper rifle. … But then I was going to bring all the explosives so, but I don't know if they got…I don't know." MOESSER further stated, "Yeah the gun was in my name. And MALANGA took it to the airport to get it changed over to his name but they still have the information it was in my name originally. Cause I bought it brand new. So that's a, kind of a bad deal." MOESSER also stated that he had every intent on joining Christian, MALANGA, POLUN, THOMPSON, and the rebel army in Africa to participate in the attack. He stated that he was going to be a sniper.

78. The evidence gathered from MALANGA's data storage account shows a screen capture of a text chat, dated March 30, 2024, where MOESSER discusses travel plans to come to Africa. MOESSER also stated that he wanted to schedule a "croc" hunt before he returned home, so he was asking for a return date. MOESSER also sent an image of his U.S. Passport, passport number, and expiration date.

79. On or about April 10, 2024, MALANGA possessed and carried a firearm from the United States to Africa intending to engage in conduct that would be a felony and to further the ends of the conspiracy. MALANGA completed and signed CBP Form 4457, a Certificate of Registration for Personal Effects Taken Abroad. On the form, MALANGA described the firearm as "XDE Smith & Weason [sic] .45 He116508." As depicted below, MALANGA had a picture of the CBP form in his data storage account.



OMB CONTROL NUMBER: 1651-0010

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

CERTIFICATE OF REGISTRATION
FOR PERSONAL EFFECTS TAKEN ABROAD
19 CFR 148.1

Number:

Name of Owner(Last,First,MI): Malanga Marcel Malo

Address of Owner(Street,City,State,Zipcode): 8916 S 4420 W West Jordan UT 84088

Description of Articles: XDE Smith & Weason .45 He116508

I certify that the information shown hereon is true and correct to the best of my knowledge and belief.

Signature of Owner:

Port: Salt Lake City POE

Date: Apr 9, 2024

Signature of CBP Official:

Certifying officer shall draw lines through all unused spaces with ink.

CBP Form 4457 (5/22)

Page 1 of 2

80. On the same day, THOMPSON, possessed and carried a firearm from the United States to Africa intending to engage in conduct that would be a felony and to further the ends of the conspiracy. THOMPSON completed and signed CBP Form 4457, a Certificate of Registration for Personal Effects Taken Abroad. On the form, THOMPSON described the firearm as a "1911 Firestorm .45 71040365402." As depicted below, MALANGA had a picture of the CBP form in his data storage account.



OMB CONTROL NUMBER: 1651-0010

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

CERTIFICATE OF REGISTRATION
FOR PERSONAL EFFECTS TAKEN ABROAD
19 CFR 148.1

Number:

Name of Owner(Last,First,MI): Thompson Tysler Christian Jr

Address of Owner(Street,City,State,Zipcode): 6866 S. 5785 W. West Jordan UT 84081

Description of Articles: 1911 firestorm 45 71040365402

I certify that the information shown hereon is true and correct to the best of my knowledge and belief.

Signature of Owner:

Port: Salt Lake City POE

Date: Apr 9, 2024

Signature of CBP Official:

Customs and Border Protection Port of SLC (3301) APR 0 9 2024 CBP Officer

Certifying officer shall draw lines through all unused spaces with ink.

CBP Form 4457 (5/22)

Page 1 of 2

81. According to a firearms trace summary conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, THOMPSON's .45 caliber Firestorm firearm, referenced above, was originally purchased by MOESSER on or about November 2, 2014, in Salt Lake City, Utah.

82. According to Person #12, MALANGA and THOMPSON departed for Africa on or about April 10, 2024, from the Salt Lake City International Airport. The trip included layovers in Seattle, Washington, and Doha, Qatar, before they arrived in Johannesburg, South Africa, on April 12, 2024. This flight information is corroborated from legal process issued to Alaska Airlines and Qatar Airlines for both MALANGA and THOMPSON.

83. On or about April 11, 2024, MALANGA video recorded THOMPSON in possession of, and handling, the Firestorm 1911 .45 caliber firearm. During the recording, MALANGA calls the firearm a "Firestorm 1911." Also, in the video recording, there appear to be multiple suitcases in what appears to be a hotel room. On at least one of the suitcases there is a visible airline luggage tag which has the three-letter code "JNB" which I know is the airline code for Johannesburg's O.R. Tambo International Airport, located in South Africa. In the video, it appears that THOMPSON is unpacking the firearm from his luggage upon arrival in South Africa. Below are screenshots of THOMPSON unpacking the firearm.








84. Furthermore, THOMPSON also unpacks the flamethrower drone attachment from its box and displays it for the camera. Below is a screenshot of THOMPSON unpacking the flamethrower.



***MALANGA and THOMPSON Continue Their Firearms Training in Africa in Furtherance of the Conspiracy***

85. Several videos and photos obtained from MALANGA's data storage account show MALANGA, THOMPSON, and others continuing their firearms training while in Africa. The videos and photos show MALANGA and THOMPSON shooting both rifles and handguns.

86. In one video recording, MALANGA can be seen entering a shooting range. A sign posted above the door identifies the business as "Dave Sheer Guns." I know from the business's website that Dave Sheer Guns is located at 95 Forest Rd, Bramley, Johannesburg, 2090, South Africa.[6] The sign above the doorway also shows that they are entering the "Shooting Range." MALANGA is the individual in the black t-shirt walking into the business.

[6] https://davesheer.com/contacts-2/

Case 2:25-mj-00346-DBP Document 2 Filed 04/05/25 PageID.142 Page 60 of 87




87. In two other video recordings, MALANGA and THOMPSON can be seen practicing shooting at targets that depict a human as a target. MALANGA is depicted on the left, and THOMPSON is depicted on the right.





88. In another video recording, when MALANGA and THOMPSON are leaving the shooting range, MALANGA says, "We just got done at the range, me and Tyler did…." MALANGA continues by stating, "able to shoot some AR-15s and a Glock 17 9mm." MALANGA asks THOMPSON, "How did you like it, Tyler?" THOMPSON replies, "I feel comfortable."

***MALANGA's Internet Purchase of Drone Equipment***

89. According to information obtained through legal process from an online seller, MALANGA purchased a battery charger, adapter plug for a battery charger, drone speaker/microphone, and a GoPro camera on or about May 1, 2024, while in Africa, and had them shipped to an address in Draper, Utah.

90. MALANGA has a family member who resides at the same Draper, Utah address. According to open-source reporting, this is also the address used by POLUN during his stay in the Salt Lake City, Utah, area in early 2024.

91. The following is a screenshot of a video uploaded to YouTube[7] shortly after the coup took place depicting the DJI Mavic 2 drone. Person #5 confirmed that THOMPSON and

[7] YouTube video downloaded and captured by the FBI on May 21, 2024, from https://www.youtu.be/yi7LilEbPGE?si=-RT8oPVaMuSC417k.

MALANGA were in possession of this same drone in Utah that is depicted in the video screenshot below. Person #5 also stated that THOMPSON practiced flying the drone while in Utah. A screenshot from this video appears to show a speaker, megaphone, and/or microphone mounted on the drone.



92. The following screenshot shows an image of the drone speaker/microphone which was purchased by MALANGA. The drone megaphone in the online retailer's description appears to be identical to the one mounted to the drone that was captured by DRC security forces during or immediately following the coup as depicted in the screenshot below.



Case 1:25-mj-00124-AM Document 12 Filed 04/09/25 PageID 2145 106 Page 72 of 174

***Members of the Conspiracy Engaged in Pre-Attack Planning and Scouting of Possible Targets***

93. The members of the conspiracy planned and scouted potential targets and prepared attack plans. For example, MALANGA's data storage account contains a screenshot from what appears to be the Apple Maps application. The screenshot depicts an aerial view of houses in Kinshasa, DRC. The image has handwritten directions in red font, stating "Group 1," "Group 2," and "Group 3." Arrows direct each Group which direction to attack. I believe that this is a rough attack plan showing how the rebel army intended to assault a house in Kinshasa. Based upon FBI's analysis of the map, it is believed that the arrows focus on a residential address located on Ave. Pumbu. While there is little information about this exact residence, public news articles indicate that Jean-Pierre Bemba[8] ("Bemba") may reside on Ave. Pumbu. Moreover, in three different videos gathered during this investigation, members of the conspiracy are conducting pre-attack planning and surveillance, and one of the male voices keeps referencing Bemba, who is believed to be a target of the coup.

[8] Bemba is a Congolese politician and former rebel leader. He currently serves as the Deputy Prime Minister of Transportation and Channels of Communication. On March 23, 2023, DRC President Felix Tshisekedi named Bemba Minister of Defence in a cabinet reshuffle. *See* https://web.archive.org/web/20230402190308/https://www.france24.com/en/africa/20230324-dr-congo-appoints-former-militia-leader-bemba-to-defence-minister-post.




94. A video obtained from MALANGA's data storage account taken on or about April 28, 2024, shows a view from inside a car being driven down a street that is believed to be Ave De Lemera. At one point during the recording, the car pulls into the driveway of the British Embassy and turns around. The British Embassy is located on Ave De Lemera which, according to Google Maps, is about 900m (3-minute drive) straight down the same road from the Palais de la Nation. Christian is driving the car. It is believed that MALANGA, THOMPSON, and POLUN are riding in the car. The conversation in the car is as follows.

> Male voice says "…really wants us to get Kamerhe…that's him, that's his guards, do you see Kamerhe?...right there, that's his house right there…no resistance."
>
> Another male asks, "so who lives here?" a male responds "US ambassador…british embassy…let's imagine this, we here…can someone pin this?"

> Another male voice says, "which Whatsapp are you using, prez? Or are you using both still."
>
> Another male says "someone film in the back" (as they drive past Kamerhe's residence).
>
> A male voice says, "we get Kamerhe in his house, then we come here, turn here…once we get that guy here then we go straight…white house…now we rushing now to go to our new challenge…they heard some gunfire… there is no radio… all communication has been cut…all those guys were handcuffed. So from there, then, we come to the white house. You need to get me here, that's your job."

95. The next video from MALANGA's data storage account appears to be taken on the same day. It shows Christian, MALANGA, THOMPSON, POLUN, and several other uncharged coconspirators surveilling and scouting an area known as the Mausolée de Laurent Désiré Kabila ("Mausoleum"), which is a monument that the DRC considers one of the highlights of Kinshasa's history and tourism.[9] In front of the Mausoleum is the statue of the president, and importantly, behind the Mausoleum is the Palais de la Nation.

96. In the same video at the Mausoleum, MALANGA is filming with his camera phone upside down. Christian, MALANGA, THOMPSON, POLUN, and several other uncharged coconspirators are discussing how they are going to approach the Palais de la Nation, also known as the "white house." Some of the relevant conversation is as follows.

> THOMPSON can be heard telling Christian, "theoretically, if it's not bad, I would be able to park in between the white house…"
>
> THOMPSON says, "I would be able to fly over…."
>
> MALANGA says, "and follow."
>
> THOMPSON says "yeah, over all the cars and everything on the way to the white house"

---

[9] https://congo-tourisme.org/Lieux-embl%C3%A9matiques/mausolee-laurent-desire-kabila/

Case 2:25-mj-00134-DBP Document 2 Filed 04/05/25 PageID.148 Page 66 of 127

MALANGA says "yeah, when we have them though, are we going inside with them."

Another male says, "we will get the gun easy."

Another male voice says, "that is the president's office."

Based upon this conversation, it appears THOMPSON and MALANGA are discussing how they will use the drones during the attack. The following photo is a screenshot from the referenced video near the Mausoleum and the Palais de la Nation. The individual in the white shirt is Christian, and the individual in the blue shirt is POLUN.



97. The same video records images of the Palais de la Nation, which is directly across the street, as depicted in the screen capture below.



98. At approximately 4:38 into the video, MALANGA takes a selfie type recording of himself confirming he is holding the camera. A screenshot is shown below.



99. Several seconds later, THOMPSON can be seen in the video recording standing together talking with Christian. POLUN can be seen on the right side of the image in the blue shirt while THOMPSON is in the gray shirt and Christian is in the white shirt. The Palais de la Nation can be seen in the background. A screenshot is shown below.



100. It is evident from this video recording that the members of the conspiracy, and the rebel army, intended on targeting and attacking the DRC Palais de la Nation, which is an official DRC government building.

101. Another video recording obtained from MALANGA's data storage account taken on or about April 28, 2024, shows a busy street with male voices heard in the background. One male says, "I'm talking about the entrance, how the president enters, which gate he uses to enter."

102. In an additional video recording from MALANGA's data storage account, taken on or about April 28, 2024, a car is seen driving down a street at night in what appears to be pre-attack scouting activities. A male voice in the car says, "that's Kamerhe's house coming up right here, yeah, that's them just sitting right there." Four to five men can be seen sitting outside near some cars. Another male voice says, "imagine that flamethrower coming right there." A screenshot is shown below.



103. On or about March 24, 2025, an FBI explosives expert completed a preliminary review of the evidence and opined that a commercially available flamethrower specifically designed to be attached to a drone would constitute a destructive device if utilized as a weapon. Usage examples would include the deliberate application of the device as a weapon against person(s) and/or property, as described by the individual in the above-referenced video.

104. In a video obtained from MALANGA's data storage account, taken on May 1, 2024, there is a car driving down the street. The car occupants are talking about "Bemba's place," followed by "they're guarding the most expensive guy." Then one male voice says, "we will come like this then boom, we will start our operation." This is consistent with the previously referenced attack plan for the residence on Ave. Pumbu.

105. In a video obtained from MALANGA's data storage account, taken on or about May 1, 2024, from inside a car driving down a street, a male voice points out "the prime minister lives right here." MALANGA is a passenger in the car. After a brief stop, the car starts driving again and the male driver says, "that's where the jeep is right, that's where the prime minister lives."

106. Three days prior to the attack, on or about May 16, 2024, images from MALANGA's data storage account show individuals preparing for the attack. An individual is photographed loading rounds of ammunition into a large capacity magazine, and an AK-47 style assault rifle can been seen on the bed. POLUN can be seen looking at his cell phone and it is believed that THOMPSON is sitting on the bed.



107. In the image on the left below, obtained from MALANGA's data storage account, two open boxes containing electronic equipment are visible. The image on the right, also obtained from MALANGA's data storage account, shows MALANGA standing with what

appears to be the same device attached to his right arm.





108. The device above appears to be very similar to the signal jammer depicted in the image below on the left.[10] It is also similar to the image below on the right, which is a screenshot of a communication found on MALANGA's data storage account that was taken on or about March 1, 2024. In the communication, the sender states, "Hello president," "From china," "350$."

[10] *See* https://www.made-in-china.com/price/prodetail_Signal-Jammer_IOGToDujZLWc.html?utm_medium







109. As noted above in the video obtained from MALANGA's data storage account of the individuals turning their car around at the British Embassy in Kinshasa, the following discussion is heard while they discuss their attack planning, "now we rushing now to go to our new challenge…they heard some gunfire… there is no radio… all communication has been cut." The signal jammer device worn by MALANGA may have been the device intended to cut the communications.

110. Two days prior to the attack, on or about May 17, 2024, MALANGA appears to be making further preparations for the attack. Specifically, in the image below on the left, taken from his data storage account, MALANGA is photographed in his military style clothing and carrying an AK-47 style assault rifle. This is the same clothing and military style patches that he wore during the attack on May 19, 2024. The image below on the right was also obtained from MALANGA's data storage account and has a date and timestamp indicating it was taken early in the morning before he departed from the United States to Africa. Person #5 identified the image on the right as being taken in the basement of THOMPSON's Utah residence. MALANGA is seen wearing the same tactical vest and clothing in Utah that he wore during the coup in Africa.



***The Attack***

111. According to open-source news reporting,[11] the following timeline of events took place during the early morning hours of May 19, 2024, in Kinshasa, DRC.

112. At approximately 1:00AM, a large bus with armed men arrived at Momo 19, a hotel in southwest Kinshasa where Christian was staying. The men went into the lobby where they were briefed by Christian and told to put on their vests and equipment. While the men were putting on their gear, the bus driver fled, leaving the men stranded with only Christian's black Toyota Highlander.

113. Christian took his Highlander and drove to the roundabout of the National Pedogogical University. Once there, he hijacked an "Esprit de Vie" bus that was then used to transport his rebel force.

[11] https://www.youtube.com/watch?v=g6eFMZPZRMM – "The crazy story behind the man who tried to overthrow the Congolese president," produced by Charles Villa, December 20, 2024.

Case 2:25-mj-00346-DMP Document 12 Filed 04/05/25 Page 74 of 82 PageID 156

114. Between 2:00AM and 3:00AM, Christian and his men attacked a police station where they seized more weapons.

115. At approximately 3:30AM, Christian carjacked a gray Range Rover belonging to Victim #1 in Kinshasa. During the carjacking, Christian shot and killed Victim #1. The news report is corroborated by statements made by THOMPSON during questioning at a military trial in the DRC. THOMPSON stated that he was riding in the same jeep as Christian when they cut off the gray jeep belonging to Victim #1. When asked who shot Victim #1, THOMPSON responded, "Christian Malanga." THOMPSON further explained that Christian fired the shot from inside their jeep before immediately exiting and approaching Victim #1's gray jeep.

116. The same open-source new reporting referenced above continued to describe the timeline of events stating Christian and his men then went to the home of Minister of Defense Bemba, but Bemba was not home that night.

117. At approximately 4:30AM, Christian and his rebel force traveled to Deputy Prime Minister Vital Kamerhe's residence. Christian and his men entered the home and exchanged gunfire with Kamerhe's police guards. One of Christian's men and two of the guards were killed during this assault.

118. At approximately 5:00AM, Christian and his rebel force then traveled to the Palais de la Nation with their vehicles, including a police jeep taken from Kamerhe's police guards. Upon arrival, Christian and his rebel force began filming and live streaming their actions. After an eventual confrontation with DRC security forces, Christian is shot dead and his men, including MALANGA, THOMPSON, and POLUN, flee.

119. By approximately 9:00AM to 10:00AM, most of Christian's men had been captured, including MALANGA, THOMPSON, and POLUN.

120. Additional Social Media Platform #4 information posted on May 20, 2024,

depicts two deceased guards at Kamerhe's residence in Kinshasa.





121. Videos obtained from Christian's Social Media Platform #2, pursuant to a lawful search, depict Christian, MALANGA, THOMPSON, and POLUN along with the rest of Christian's rebel forces at the Palais de la Nation during the coup on May 19, 2024. The left screenshot depicts MALANGA with Christian standing inside the Palais de la Nation. During the Armed Coup Attack, MALANGA was carrying zipties on his vest. The right screenshot shows Christian standing in front of a body lying on the floor inside the same location.



122. In a video obtained from Christian's Social Media Platform #2, pursuant to a lawful search, the left screenshot shows one of Christian's men holding a flag of the New Zaire inside the Palais de la Nation. The right screenshot shows a black Toyota Highlander parked in front of the Palais de la Nation.

Case 2:25-mj-00146-DBP Document 1-2 Filed 04/05/25 PageID.159 Page 77 of 88



123. The below screenshots were taken from another video in Christian's Social Media Platform #2. The left screenshot shows a blue police vehicle parked outside the Palais de la Nation. The right screenshot shows a gray Range Rover parked outside the Palais de la Nation.

Case 2:25-mj-00134-DBP Document 12 Filed 04/05/25 PageID.610 Page 78 of 88






124. The below screenshots were taken from another video in Christian's Social Media Platform #2. The left screenshot shows POLUN on the left and THOMPSON on the right inside the Palais de la Nation with the signal jammer in the foreground on the counter. The right screenshot shows Christian approaching MALANGA, who is filming, while two of the other rebels are raising the flag of the New Zaire in the background.

Case 2:25-mj-00346-DBP Document 1 Filed 04/05/25 PageID.81 Page 79 of 82





125. As further depicted in the livestream videos obtained from Christian's Social Media Platform #2, MALANGA appears to be holding the phone while filming the scene at the Palais de la Nation. Christian then took the phone from MALANGA and began filming MALANGA as he lifted his weapon and demonstrated his shooting form. The following is a screenshot from this video footage.



126. In another video obtained from Christian's Social Media Platform #2, MALANGA can be observed holding an Uzi. After the video cuts away, MALANGA can be heard saying "it's jammed" while trying to manipulate the Uzi.

127. In a video obtained from MALANGA's Social Media Platform #3 account, MALANGA, while filming himself, is heard saying "hey, we need to get those two Uzis working." MALANGA flips the camera to show the chaos ensuing outside the Palais de la Nation while stating "DRC is [expletive] free." MALANGA turns the camera to himself again and states "we are liberating these people…DRC is free, we freed them." As MALANGA continues to film, gunfire is heard in the background and an individual says, "Ah, I got shot." The video concludes with gunfire in the background as MALANGA and others run for cover. The below screenshots, depicting MALANGA (left) and THOMPSON (right), were taken from this video.



128. The images depicted below were obtained from a lawful search of Christian's Social Media Platform #2 and appear to show Christian deceased while still wearing his uniform seen in the above-described videos taken during the coup.



CONCLUSION

129. In conclusion, the facts set forth above establish probable cause to believe, MALANGA, THOMPSON, POLUN, and MOESSER committed the crimes charged in this complaint. Accordingly, your affiant respectfully requests this Court issue arrest warrants for the above-named defendants.

RESPECTFULLY SUBMITTED this 5th day of April, 2025.

Chad Simkins
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 5th day of April, 2025.

United States District Court
District of Utah

DUSTIN B. PEAD
Chief United States Magistrate Judge
District of Utah

APPROVED:

FELICE JOHN VITI
Acting United States Attorney

BRYAN R. WHITTAKER
Assistant U.S. Attorney
Chief, National Security & Cybercrimes Section

TANYA SENANAYAKE
Trial Attorney, Counterterrorism Section
National Security Division
U.S. Department of Justice

JONATHAN STOWERS
Assistant U.S. Attorney

# EXHIBIT B
# Filed Separately Under Seal

AO 94 (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

United States of America
v.
Marcel Malu Malanga
*Defendant*

Case No. 25-129M

Charging District's Case No. 25mJ346

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the ______________ District of Utah ,
*(if applicable)* ______________ division. The defendant may need an interpreter for this language:
______________ .

The defendant: ❒ will retain an attorney.
☑ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date: 4/9/25

*Printed name and title*

U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | | |
|---|---|---|
| United States of America<br>v.<br>Marcel Malu Malanga<br>Defendant | ) | Case No. 25-129M<br><br>Charging District's Case No. |

**WAIVER OF RULE 5 & 5.1 HEARINGS**
**(Complaint or Indictment)**

I understand that I have been charged in another district, the (name of other court) Utah.

I have been informed of the charges and of my rights to:

(1) retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2) an identity hearing to determine whether I am the person named in the charges;

(3) production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4) a preliminary hearing to determine whether there is probable cause to believe that an offense has been committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise, unless I have been indicted beforehand.

(5) a hearing on any motion by the government for detention;

(6) request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

- ☒ an identity hearing and production of the warrant.
- ☒ a preliminary hearing.
- ☐ a detention hearing.
- ☒ an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary or detention hearing to which I may be entitled in this district. I request that any preliminary or detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: 4/9/25

[signature]
Defendant's signature

[signature]
Signature of defendant's attorney

BENJAMIN YASTER
Printed name of defendant's attorney

This document has not been officially approved by the Administrative Office or the Judicial Conference of the United States.

CJA-23
(Rev 3/21)

# FINANCIAL AFFIDAVIT

IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE

**IN THE UNITED STATES** ☑ DISTRICT COURT ☐ COURT OF APPEALS ☐ OTHER *(Specify Below)*

IN THE CASE OF

United States v. Malanga

FOR

AT

LOCATION NUMBER

PERSON REPRESENTED *(Show your full name)*

CHARGE/OFFENSE *(Describe if applicable & check box→)* ☑ Felony ☐ Misdemeanor

1 ☑ Defendant - Adult
2 ☐ Defendant - Juvenile
3 ☐ Appellant
4 ☐ Probation Violator
5 ☐ Supervised Release Violator
6 ☐ Habeas Petitioner
7 ☐ 2255 Petitioner
8 ☐ Material Witness
9 ☐ Other *(Specify)* ______

DOCKET NUMBERS
Magistrate Judge
District Court
Court of Appeals

## ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

**INCOME & ASSETS**

**EMPLOYMENT**

Do you have a job? ☐ Yes ☑ No

**IF YES,** how much do you earn per month? ______

Will you still have a job after this arrest? ☐ Yes ☐ No ☐ Unknown

**PROPERTY**

Do you own any of the following, and if so, what is it worth?

| | APPROXIMATE VALUE | DESCRIPTION & AMOUNT OWED |
|---|---|---|
| Home | $ | |
| Car/Truck/Vehicle | $ | |
| Boat | $ | |
| Stocks/bonds | $ | |
| Other property | $ | |

**CASH & BANK ACCOUNTS**

Do you have any cash, or money in savings or checking accounts? ☐ Yes ☑ No

**IF YES,** give the total approximate amount after monthly expenses $______

**OBLIGATIONS, EXPENSES, & DEBTS**

How many people do you financially support? ______

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
|---|---|---|
| Housing | $ | $ |
| Groceries | $ | $ |
| Medical expenses | $ | $ |
| Utilities | $ | $ |
| Credit cards | $ | $ |
| Car/Truck/Vehicle | $ | $ |
| Childcare | $ | $ |
| Child support | $ | $ |
| Insurance | $ | $ |
| Loans | $ | $ |
| Fines | $ | $ |
| Other | $ | $ |

I certify under penalty of perjury that the foregoing is true and correct.

[signature]

SIGNATURE OF DEFENDANT
(OR PERSON SEEKING REPRESENTATION)

4/9/25
Date

AO 94 (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

United States of America
v.
Tyler Christian Thompson Jr.
*Defendant*

Case No. 25-129M

Charging District's Case No. 25MJ 346

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the ______________ District of Utah ,
*(if applicable)* ______________ division. The defendant may need an interpreter for this language:
______________ .

The defendant: ☐ will retain an attorney.
☑ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date: 4/9/25

U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | | |
|---|---|---|
| United States of America<br>v.<br>Tyler Christian Thompson, Jr.<br>Defendant | ) | Case No. 25 MJ 129<br><br>Charging District's Case No. 25MJ00346-DBP |

## WAIVER OF RULE 5 & 5.1 HEARINGS
## (Complaint or Indictment)

I understand that I have been charged in another district, the (name of other court) District of Utah.

I have been informed of the charges and of my rights to:

(1) retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2) an identity hearing to determine whether I am the person named in the charges;

(3) production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4) a preliminary hearing to determine whether there is probable cause to believe that an offense has been committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise, unless I have been indicted beforehand.

(5) a hearing on any motion by the government for detention;

(6) request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

- ☒ an identity hearing and production of the warrant.
- ☒ a preliminary hearing.
- ☒ a detention hearing.
- ☒ an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary or detention hearing to which I may be entitled in this district. I request that any preliminary or detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: 4/9/2025

[signature]
Defendant's signature

[signature]
Signature of defendant's attorney

James M. Branden
Printed name of defendant's attorney

This document has not been officially approved by the Administrative Office or the Judicial Conference of the United States.

CJA-23
(Rev 3/21)

# FINANCIAL AFFIDAVIT

IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE

**IN THE UNITED STATES** ☐ DISTRICT COURT ☐ COURT OF APPEALS ☐ OTHER *(Specify Below)*

IN THE CASE OF U.S.A. v. Thompson

FOR

AT

LOCATION NUMBER

PERSON REPRESENTED *(Show your full name)*

Tyler Christian Thompson, Jr.

CHARGE/OFFENSE *(Describe if applicable & check box→)* ☑ Felony ☐ Misdemeanor

18 USC 2339A / 18 USC 2332a(b)

1 ☑ Defendant - Adult
2 ☐ Defendant - Juvenile
3 ☐ Appellant
4 ☐ Probation Violator
5 ☐ Supervised Release Violator
6 ☐ Habeas Petitioner
7 ☐ 2255 Petitioner
8 ☐ Material Witness
9 ☐ Other *(Specify)*

DOCKET NUMBERS
Magistrate Judge: Marutollo
District Court: EDNY
Court of Appeals:

## ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

**INCOME & ASSETS**

**EMPLOYMENT**

Do you have a job? ☐ Yes ☒ No

**IF YES,** how much do you earn per month? ______

Will you still have a job after this arrest? ☐ Yes ☐ No ☐ Unknown

**PROPERTY**

Do you own any of the following, and if so, what is it worth?

| | APPROXIMATE VALUE | DESCRIPTION & AMOUNT OWED |
|---|---|---|
| Home | $ | |
| Car/Truck/Vehicle | $ 10,000 | 10,000 — zero net worth |
| Boat | $ | |
| Stocks/bonds | $ | |
| Other property | $ | |

**CASH & BANK ACCOUNTS**

Do you have any cash, or money in savings or checking accounts? ☐ Yes ☒ No

**IF YES,** give the total approximate amount after monthly expenses $ N/A

**OBLIGATIONS, EXPENSES, & DEBTS**

How many people do you financially support? ______

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
|---|---|---|
| Housing | $ | $ |
| Groceries | $ | $ |
| Medical expenses | $ | $ |
| Utilities | $ | $ |
| Credit cards | $ | $ |
| Car/Truck/Vehicle | $ | $ |
| Childcare | $ | $ |
| Child support | $ | $ |
| Insurance | $ | $ |
| Loans | $ | $ |
| Fines | $ | $ |
| Other | $ | $ |

N/A

I certify under penalty of perjury that the foregoing is true and correct.

[signature]

SIGNATURE OF DEFENDANT
(OR PERSON SEEKING REPRESENTATION)

4/9/2025
Date

CJA 20 APPOINTMENT OF AND AUTHORITY TO PAY COURT-APPOINTED COUNSEL (Rev. 07/17)

| | | |
|---|---|---|
| 1. CIR./DIST./ DIV. CODE<br>EDNY | 2. PERSON REPRESENTED<br>Tyler Christian Thompson Jr. | VOUCHER NUMBER |

| | | | |
|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER<br>25 MJ 129 | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF *(Case Name)*<br>USA v. Thompson et al | 8. PAYMENT CATEGORY<br>☑ Felony ☐ Petty Offense<br>☐ Misdemeanor ☐ Other<br>☐ Appeal | 9. TYPE PERSON REPRESENTED<br>☑ Adult Defendant ☐ Appellant<br>☐ Juvenile Defendant ☐ Appellee<br>☐ Other | 10. REPRESENTATION TYPE<br>*(See Instructions)*<br>CC |

11. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*

18 USC 2339A

12. ATTORNEY'S NAME *(First Name, M.I., Last Name, including any suffix),* AND MAILING ADDRESS

James Branden
80 Bay Street Landing, Ste. 7J
Staten Island, NY 10301

Telephone Number : (212) 286-0173

13. COURT ORDER

☑ O Appointing Counsel ☐ C Co-Counsel
☐ F Subs For Federal Defender ☐ R Subs For Retained Attorney
☐ P Subs For Panel Attorney ☐ Y Standby Counsel

Prior Attorney's Appointment Dates: ______

☐ Because the above-named person represented has testified under oath or has otherwise satisfied this Court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 12 is appointed to represent this person in this case, OR

☐ Other *(See Instructions)*

Joseph A. Marutollo

Signature of Presiding Judge or By Order of the Court

4/9/2025 — Date of Order
4/9/2025 — Nunc Pro Tunc Date

Repayment or partial repayment ordered from the person represented for this service at time appointment. ☐ YES ☐ NO

14. NAME AND MAILING ADDRESS OF LAW FIRM *(Only provide per instructions)*

## CLAIM FOR SERVICES AND EXPENSES / FOR COURT USE ONLY

| | CATEGORIES *(Attach itemization of services with dates)* | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|---|
| 15. In Court | a. Arraignment and/or Plea | | 0.00 | | 0.00 | |
| | b. Bail and Detention Hearings | | 0.00 | | 0.00 | |
| | c. Motion Hearings | | 0.00 | | 0.00 | |
| | d. Trial | | 0.00 | | 0.00 | |
| | e. Sentencing Hearings | | 0.00 | | 0.00 | |
| | f. Revocation Hearings | | 0.00 | | 0.00 | |
| | g. Appeals Court | | 0.00 | | 0.00 | |
| | h. Other *(Specify on additional sheets)* | | 0.00 | | 0.00 | |
| | **(RATE PER HOUR = $ ) TOTALS:** | 0.00 | 0.00 | 0.00 | 0.00 | |
| 16. Out of Court | a. Interviews and Conferences | | 0.00 | | 0.00 | |
| | b. Obtaining and reviewing records | | 0.00 | | 0.00 | |
| | c. Legal research and brief writing | | 0.00 | | 0.00 | |
| | d. Travel time | | 0.00 | | 0.00 | |
| | e. Investigative and other work *(Specify on additional sheets)* | | 0.00 | | 0.00 | |
| | **(RATE PER HOUR = $ ) TOTALS:** | 0.00 | 0.00 | 0.00 | 0.00 | |
| 17. | Travel Expenses *(lodging, parking, meals, mileage, etc.)* | | | | | |
| 18. | Other Expenses *(other than expert, transcripts, etc.)* | | | | | |
| **GRAND TOTALS (CLAIMED AND ADJUSTED):** | | | 0.00 | | 0.00 | |

| | | |
|---|---|---|
| 19. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE<br>FROM: ______ TO: ______ | 20. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION | 21. CASE DISPOSITION |

22. CLAIM STATUS ☐ Final Payment ☐ Interim Payment Number ______ ☐ Supplemental Payment

Have you previously applied to the court for compensation and/or reimbursement for this case? ☐ YES ☐ NO If yes, were you paid? ☐ YES ☐ NO

Other than from the Court, have you, or to your knowledge has anyone else, received payment *(compensation or anything of value)* from any other source in connection with this representation? ☐ YES ☐ NO If yes, give details on additional sheets.

**I swear or affirm the truth or correctness of the above statements.**

Signature of Attorney ______ Date ______

## APPROVED FOR PAYMENT — COURT USE ONLY

| | | | | |
|---|---|---|---|---|
| 23. IN COURT COMP. | 24. OUT OF COURT COMP. | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMT. APPR./CERT.<br>$0.00 |
| 28. SIGNATURE OF THE PRESIDING JUDGE | | | DATE | 28a. JUDGE CODE |
| 29. IN COURT COMP. | 30. OUT OF COURT COMP. | 31. TRAVEL EXPENSES | 32. OTHER EXPENSES | 33. TOTAL AMT. APPROVED<br>$0.00 |
| 34. SIGNATURE OF CHIEF JUDGE, COURT OF APPEALS (OR DELEGATE) *Payment approved in excess of the statutory threshold amount.* | | | DATE | 34a. JUDGE CODE |

AO 94 (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

United States of America
v.
Benjamin R. Zalman-Polun
*Defendant*

Case No. 25-129M

Charging District's Case No. 25MJ 346

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the ______________ District of Utah,
*(if applicable)* ______________ division. The defendant may need an interpreter for this language:
______________ .

The defendant: ❒ will retain an attorney.
☑ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date: 4/9/25

*Printed name and title*

U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
for the
Eastern District of New York

United States of America
v.
Benjamin Reuben Zalman-Polun
Defendant

Case No.

Charging District's Case No. 25 mj 129

## WAIVER OF RULE 5 & 5.1 HEARINGS
**(Complaint or Indictment)**

I understand that I have been charged in another district, the (name of other court) District of Utah.

I have been informed of the charges and of my rights to:

(1) retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2) an identity hearing to determine whether I am the person named in the charges;

(3) production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4) a preliminary hearing to determine whether there is probable cause to believe that an offense has been committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise, unless I have been indicted beforehand.

(5) a hearing on any motion by the government for detention;

(6) request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

- [x] an identity hearing and production of the warrant.
- [x] a preliminary hearing.
- [ ] a detention hearing.
- [x] an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary or detention hearing to which I may be entitled in this district. I request that any preliminary or detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: 4-9-2025

[signature]
Defendant's signature

[signature]
Signature of defendant's attorney

Sabrina Shroff
Printed name of defendant's attorney

This document has not been officially approved by the Administrative Office or the Judicial Conference of the United States.

CJA-23
(Rev 3/21)

# FINANCIAL AFFIDAVIT

IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE

**IN THE UNITED STATES** ☐ DISTRICT COURT ☐ COURT OF APPEALS ☐ OTHER *(Specify Below)*

IN THE CASE OF

FOR

V.

AT

LOCATION NUMBER

PERSON REPRESENTED *(Show your full name)*

Benjamin Reuben Zalman-Paulin

CHARGE/OFFENSE *(Describe if applicable & check box→)* ☐ Felony ☐ Misdemeanor

1 ☐ Defendant - Adult
2 ☐ Defendant - Juvenile
3 ☐ Appellant
4 ☐ Probation Violator
5 ☐ Supervised Release Violator
6 ☐ Habeas Petitioner
7 ☐ 2255 Petitioner
8 ☐ Material Witness
9 ☐ Other *(Specify)* ______

DOCKET NUMBERS
Magistrate Judge
District Court
Court of Appeals

## ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

**INCOME & ASSETS**

**EMPLOYMENT**

Do you have a job? ☐ Yes ☒ No
**IF YES,** how much do you earn per month? ______
Will you still have a job after this arrest? ☐ Yes ☒ No ☐ Unknown

**PROPERTY**

Do you own any of the following, and if so, what is it worth?

| | APPROXIMATE VALUE | DESCRIPTION & AMOUNT OWED |
|---|---|---|
| Home | $ | |
| Car/Truck/Vehicle | $ n/a | |
| Boat | $ | |
| Stocks/bonds | $ | |
| Other property | $ | |

**CASH & BANK ACCOUNTS**

Do you have any cash, or money in savings or checking accounts? ☐ Yes ☒ No
**IF YES,** give the total approximate amount after monthly expenses $ 0

**OBLIGATIONS, EXPENSES, & DEBTS**

How many people do you financially support? ______

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
|---|---|---|
| Housing | $ | $ |
| Groceries | $ | $ |
| Medical expenses | $ | $ |
| Utilities | $ | $ |
| Credit cards | $ n/A | $ |
| Car/Truck/Vehicle | $ | $ |
| Childcare | $ | $ |
| Child support | $ | $ |
| Insurance | $ | $ |
| Loans | $ | $ |
| Fines | $ | $ |
| Other | $ | $ |

I certify under penalty of perjury that the foregoing is true and correct.

[signature]
SIGNATURE OF DEFENDANT
(OR PERSON SEEKING REPRESENTATION)

4-1-2025
Date

CJA 20 APPOINTMENT OF AND AUTHORITY TO PAY COURT-APPOINTED COUNSEL (Rev. 07/17)

| 1. CIR./DIST./ DIV. CODE | 2. PERSON REPRESENTED | VOUCHER NUMBER |
|---|---|---|
| EDNY | Benjamin Reuben Zalman-Polun | |

| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
|---|---|---|---|
| 25 MJ 129 | | | |

| 7. IN CASE/MATTER OF *(Case Name)* | 8. PAYMENT CATEGORY | 9. TYPE PERSON REPRESENTED | 10. REPRESENTATION TYPE *(See Instructions)* |
|---|---|---|---|
| USA v. Zalman-Polun et al | ☑ Felony ☐ Petty Offense ☐ Misdemeanor ☐ Other ☐ Appeal | ☑ Adult Defendant ☐ Appellant ☐ Juvenile Defendant ☐ Appellee ☐ Other | CC |

11. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*

18 USC 2339A

12. ATTORNEY'S NAME *(First Name, M.I., Last Name, including any suffix),* AND MAILING ADDRESS

Sabrina Shroff
80 Broad Street, 19th Floor
New York, NY 10004

Telephone Number : (646) 763-1490

14. NAME AND MAILING ADDRESS OF LAW FIRM *(Only provide per instructions)*

13. COURT ORDER

☑ O Appointing Counsel ☐ C Co-Counsel
☐ F Subs For Federal Defender ☐ R Subs For Retained Attorney
☐ P Subs For Panel Attorney ☐ Y Standby Counsel

Prior Attorney's Appointment Dates:

☐ Because the above-named person represented has testified under oath or has otherwise satisfied this Court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 12 is appointed to represent this person in this case, OR

☐ Other *(See Instructions)* Joseph A. Marutollo

Signature of Presiding Judge or By Order of the Court

4/9/2025 — Date of Order
4/9/2025 — Nunc Pro Tunc Date

Repayment or partial repayment ordered from the person represented for this service at time appointment. ☐ YES ☐ NO

## CLAIM FOR SERVICES AND EXPENSES / FOR COURT USE ONLY

| | CATEGORIES *(Attach itemization of services with dates)* | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|---|
| 15. In Court | a. Arraignment and/or Plea | | 0.00 | | 0.00 | |
| | b. Bail and Detention Hearings | | 0.00 | | 0.00 | |
| | c. Motion Hearings | | 0.00 | | 0.00 | |
| | d. Trial | | 0.00 | | 0.00 | |
| | e. Sentencing Hearings | | 0.00 | | 0.00 | |
| | f. Revocation Hearings | | 0.00 | | 0.00 | |
| | g. Appeals Court | | 0.00 | | 0.00 | |
| | h. Other *(Specify on additional sheets)* | | 0.00 | | 0.00 | |
| | **(RATE PER HOUR = $ )** **TOTALS:** | 0.00 | 0.00 | 0.00 | 0.00 | |
| 16. Out of Court | a. Interviews and Conferences | | 0.00 | | 0.00 | |
| | b. Obtaining and reviewing records | | 0.00 | | 0.00 | |
| | c. Legal research and brief writing | | 0.00 | | 0.00 | |
| | d. Travel time | | 0.00 | | 0.00 | |
| | e. Investigative and other work *(Specify on additional sheets)* | | 0.00 | | 0.00 | |
| | **(RATE PER HOUR = $ )** **TOTALS:** | 0.00 | 0.00 | 0.00 | 0.00 | |
| 17. | Travel Expenses *(lodging, parking, meals, mileage, etc.)* | | | | | |
| 18. | Other Expenses *(other than expert, transcripts, etc.)* | | | | | |
| | **GRAND TOTALS (CLAIMED AND ADJUSTED):** | | 0.00 | | 0.00 | |

19. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE
**FROM:** ______ **TO:** ______

20. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION

21. CASE DISPOSITION

22. CLAIM STATUS ☐ Final Payment ☐ Interim Payment Number ______ ☐ Supplemental Payment

Have you previously applied to the court for compensation and/or reimbursement for this case? ☐ YES ☐ NO If yes, were you paid? ☐ YES ☐ NO
Other than from the Court, have you, or to your knowledge has anyone else, received payment *(compensation or anything of value)* from any other source in connection with this representation? ☐ YES ☐ NO If yes, give details on additional sheets.
**I swear or affirm the truth or correctness of the above statements.**

Signature of Attorney ______ Date ______

## APPROVED FOR PAYMENT — COURT USE ONLY

| 23. IN COURT COMP. | 24. OUT OF COURT COMP. | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMT. APPR./CERT. |
|---|---|---|---|---|
| | | | | $0.00 |

| 28. SIGNATURE OF THE PRESIDING JUDGE | DATE | 28a. JUDGE CODE |
|---|---|---|
| | | |

| 29. IN COURT COMP. | 30. OUT OF COURT COMP. | 31. TRAVEL EXPENSES | 32. OTHER EXPENSES | 33. TOTAL AMT. APPROVED |
|---|---|---|---|---|
| | | | | $0.00 |

| 34. SIGNATURE OF CHIEF JUDGE, COURT OF APPEALS (OR DELEGATE) *Payment approved in excess of the statutory threshold amount.* | DATE | 34a. JUDGE CODE |
|---|---|---|
| | | |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>MARCEL MALU MALANGA<br>TYLER CHRISTIAN THOMPSON Jr.<br>BENJAMIN REUBEN ZALMAN-POLUN,<br>Defendant(s). | 25-MJ-129<br><br><u>ORDER</u> |

JOSEPH A. MARUTOLLO, United States Magistrate Judge:

This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), to confirm the Government's disclosure obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations.

The Government must disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" and that is known to the Government. *Id.* at 87. This obligation applies regardless of whether the defendant requests this information or whether the information would itself constitute admissible evidence. The Government shall disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case.

As part of these obligations, the Government must disclose any information that can be used to impeach the trial testimony of a Government witness within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny. Such information must be disclosed sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at such other time as the Court may order.[1]

[1] This Order does not purport to set forth an exhaustive list of the Government's disclosure obligations.

The foregoing obligations are continuing ones and apply to materials that become known to the Government in the future. These obligations also apply to information that is otherwise subject to disclosure regardless of whether the Government credits it.

In the event the Government believes that a disclosure under this Order would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of its obligations, which may include in camera review or withholding or subjecting to a protective order all or part of the information otherwise subject to disclosure.[2]

For purposes of this Order, the Government has an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged.

If the Government fails to comply with this Order, the Court, in addition to ordering production of the information, may:

(1) specify the terms and conditions of such production;

(2) grant a continuance;

(3) impose evidentiary sanctions;

(4) impose contempt or other sanctions on any lawyer responsible for violations of the Government's disclosure obligations, or refer the matter to disciplinary authorities;

(5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or

(6) enter any other order that is just under the circumstances.

---

[2] The Classified Information Procedures Act sets forth separate procedures to be followed in the event that the Government believes matters relating to classified information may arise in connection with the prosecution. *See* 18 U.S.C. app. 3 §§ 1 *et seq*.

SO ORDERED.

Dated: APRIL 9, 2025
BROOKLYN, NEW YORK

Joseph A. Marutollo
United States Magistrate Judge